UTAH DEPARTMENT OF ADMINISTRATIVE SERVICES, Plaintiff,

v.

PUBLIC SERVICE COMMISSION; Milly O. Bernard, Chairman, David R. Irvine, Commissioner, and Brent H. Cameron, Commissioner, Defendants.

UTILITY SHAREHOLDERS ASSOCIATION OF UTAH, Alex Oblad and Harold Burton, Plaintiffs,

v.

PUBLIC SERVICE COMMISSION; Milly O. Bernard, Chairman; David R. Irvine, Commissioner; and Brent H. Cameron, Commissioner, Defendants.

UTAH STATE COALITION OF SENIOR CITIZENS, Plaintiff,

v.

PUBLIC SERVICE COMMISSION; Milly O. Bernard, Chairman; David Irvine, Commissioner; and Brent H. Cameron, Commissioner, Defendants.

Nos. 18304, 18286 and 18303.

Supreme Court of Utah.

Jan. 6, 1983.

Donald B. Holbrook, Robert S. McConnell and Elizabeth M. Haslam of Jones, Waldo, Holbrook & McDonough, Salt Lake City, for Utility Shareholders Assn.

Bruce Plenk and Ronald E. Nehring of Utah Legal Services, Salt Lake City, for Coalition of Senior Citizens.

Craig Rich, Asst. Atty. Gen., Salt Lake City, for Public Service Com'n.

Edward W. Clyde of Clyde, Pratt, Gibbs and Cahoon, Robert S. Campbell and Gregory B. Monson of Watkiss & Campbell, and Ray G. Groussman, Salt Lake City, for Mountain Fuel Supply Company, real party in interest.

Calvin L. Rampton of Jones, Waldo, Holbrook & McDonough, Salt Lake City, for Wexpro, real party in interest.

Stephen H. Anderson, Merlin O. Baker and A. Robert Thorup of Ray, Quinney & Nebeker, Salt Lake City, for State Division of Public Utilities.

Thomas A. Quinn of Ray, Quinney & Nebeker, Salt Lake City, for Committee of Consumer Services.

OAKS, Justice:

For over forty years, Mountain Fuel Supply Co. (MFS) has conducted oil and gas exploration activities to assure continuing supplies of natural gas for its customers. As a result, current gas production from MFS wells accounts for over thirty percent of its total requirements. Consumers (ratepayers) pay cost-of-service prices for this gas, a fraction of the federally regulated market price (about one-third in 1977). Since 1947, all or part of the expenses of such exploration and development have been treated as normal utility operating expenses and, with regulatory approval, have been paid by MFS ratepayers in the same manner as expenses for the cost and distribution of gas.[1] But, as the comparative scale of such expenditures grew, it became apparent that this manner of funding was fundamentally inconsistent with an

Jay D. Gurmankin and Stephen H. Blum of Giauque & Williams, Salt Lake City, for Administrative Services.

1. These expenses include geophysical work, dry-hole expenses, cancelled leases, and delay rentals, but not the costs of acquiring unexplored acreage (by purchase or lease) or the costs of producing wells, both of which have been capitalized.

unregulated oil and gas exploration program. Consequently, the practice was increasingly controversial with customers, stockholders, and the Public Service Commission. Beginning in 1972, the Commission required an increasing proportion of the exploration and development expenses to be paid from company resources rather than ratepayer accounts. In the period from 1972 through 1976, MFS provided about $8 million of these expenses and the ratepayers, $17 million. Effective in 1976, exploration and development expenses were divided equally.

In 1976, MFS transferred its so-called "oil properties" (according to company definition) to Wexpro Company, a wholly owned subsidiary, and MFS and Wexpro entered into a joint exploration agreement to govern Wexpro's exploration activities. Others saw this action as a transfer of valuable utility properties financed by ratepayers to an unregulated company which would be free to use them exclusively for the benefit of MFS shareholders. The transfer to Wexpro was vigorously challenged by the Division of Public Utilities of the Utah Department of Business Regulation and by its Committee of Consumer Services (hereinafter the Division of Public Utilities or the Division), who were authorized to represent the public interest before the Commission.[2]

The Public Service Commission approved MFS's transfer of the oil properties and its joint exploration agreement with Wexpro, concluding that this placed the properties beyond its jurisdiction. This Court disagreed, reversing the Commission and remanding the case for further proceedings. *Committee of Consumer Services v. Public*

*Service Commission,* Utah, 595 P.2d 871 (1979), *cert. denied,* 444 U.S. 1014, 100 S.Ct. 664, 62 L.Ed.2d 644 (1980) (hereinafter *Wexpro I*).

After the remand, MFS, Wexpro, and the Division of Public Utilities negotiated a settlement agreement and applied to the Commission for its approval. After extensive public hearings, the Commission approved the agreement as being in the public interest. Several parties have now come to this Court for petitions for review to upset the Commission's order. In No. 18286, the Utility Shareholders Association of Utah (hereinafter Shareholders Association) contends that the order is unfair to MFS's shareholders. In No. 18303, the Utah State Coalition of Senior Citizens (hereinafter Coalition) contends that the order is unfair to consumers. Both of these plaintiffs participated in the Commission's hearings. In contrast, the plaintiff in No. 18304, the Utah Department of Administrative Services (hereinafter Department), which mounts the most comprehensive attack on the unfairness of the Commission's order to consumers, did not appear before the Commission until after the Commission's order was issued. The Department then petitioned for intervention and rehearing, but the Commission denied these petitions as untimely and serving no useful purpose. The other parties have not challenged the Department's standing to pursue its petition for review in this Court.[3]

In *Wexpro I,* this Court held that "[a]ny transfer of a utility asset should be for fair market value so an appropriate benefit therefrom will redound to the credit of the ratepayers." Consequently, we directed,

---

**2.** The Division of Public Utilities is an administrative department, U.C.A., 1953, § 13–1–1.3, which this Court has recognized as "an advocate to assert and protect the interests of the people of this state," with standing to seek review of a decision of the Public Service Commission. *Utah Dep't of Business Regulation v. Public Service Commission,* Utah, 614 P.2d 1242, 1253 (1980). The Committee of Consumer Services consists of five citizens appointed by the governor and functioning within the Division of Public Utilities as advocates before the Public Service Commission for the interests of residential and small commercial users of

utility services. U.C.A., 1953, §§ 54–10–2, 54–10–4.

**3.** The Department of Administrative Services was created by law in 1981 to provide state government with administrative services, including purchasing. U.C.A., 1953, §§ 63–1–1 to –49. In its petition for intervention, the Department stated that as "a large purchaser of natural gas distributed by MFS" it was a "party pecuniarily interested in the public utility affected" and therefore entitled to apply for rehearing pursuant to U.C.A., 1953, § 54–7–15(1).

"there must be an evidentiary hearing" in which the Commission "must reassess the transfer and determine whether the properties were utility assets" and whether the transfer "is in the public interest." 595 P.2d at 878. Our review of the events and proceedings which followed that mandate begins with a summary of the terms of the settlement (Part I), and a discussion of our scope of review of Commission findings and conclusions (Part II). The substantive issues for our decision in this proceeding fall into three categories, treated in Parts III, IV, and V, as follows:

Part III. Were the Commission's proceedings consistent with the mandate of this Court?

Part IV. Was the Commission correct in concluding that the settlement was in the public interest?

Part V. Did the Commission's order specify an appropriate degree of finality for its decision?

## I. FACTS AND SETTLEMENT ON REMAND

The facts and problems that faced the parties and the Commission after remand were not the same as those that had been before this Court. The ground was shifting beneath their feet, partly because of the parties' own actions, but more importantly because of legal and economic realities over which neither had complete control. Wexpro exercised its equitable right (recognized in *Wexpro I,* 595 P.2d at 879) to terminate the joint exploration agreement. Thereafter, the parties sought new approaches to the development and exploration of the contested properties that would be feasible and legal.

Without notice to the Commission, MFS and Wexpro filed applications with the Federal Energy Regulatory Commission (FERC) to approve transfer of all of its unexplored properties to Celsius Energy Co. (hereinafter Celsius), a newly organized subsidiary of MFS. If such jurisdiction were exercised by FERC, this could free the contested properties for exploration and development, but it could also result in the requirement that any resulting gas production be supplied to MFS's ratepayers at the much higher federally regulated market prices rather than at the current cost-of-service prices.[4] When MFS later attempted to transfer properties to Celsius without Commission or FERC approval, the Division of Public Utilities blocked the attempt by a proceeding in the Commission. MFS, Wexpro, and the Shareholders Association sued the Commission in the United States District Court for the District of Utah, seeking a declaration that Commission regulation of certain MFS properties violated the United States Constitution.[5]

In the meantime, exploration and development activities on all of MFS's unexplored (wildcat) acreage, including some acreage on which MFS ratepayers had a proprietary interest under *Wexpro I,* remained at a standstill. MFS maintained that it was practically impossible to conduct a petroleum exploration and development program that was subject to limited rates of return and other regulation by the Commission. MFS shareholders would not approve corporate investments on that basis, outside venture capital was not available for that purpose, and neither co-venturers nor the skilled company employees necessary to conduct such operations would be available under those circumstances. MFS leases on some wildcat acreage were expiring and the time for commencing drilling on other leases (to avoid forfeiture) was growing shorter with each passing month.[6]

---

4. *Mid-Louisiana Gas Co. v. Federal Energy Regulatory Commission,* 664 F.2d 530, 538 (5th Cir.1981), *cert. denied,* —— U.S. ——, 102 S.Ct. 2265, 73 L.Ed.2d 1281 (1982).

5. *Mountain Fuel Supply Co. v. Public Service Commission* Civ. No. C80–0710J (D.Utah, July 28, 1981) (later dismissed without prejudice).

6. The record shows the following expiration dates for MFS leases on the wildcat acreage:

| | |
|---|---|
| 1982 | 11 percent |
| 1983 | 21 percent |
| 1984 | 9 percent |
| 1985 | 16 percent |
| Total expirations by end of 1985 | 57 percent |

In summary, following remand from this Court the controversy between MFS and the Division of Public Utilities continued in the Commission, in the FERC, and in the United States District Court. Uncertainties about the outcome made it difficult or impossible for MFS to explore and develop its wildcat acreage, which was being lost as leases expired with the passage of time. Litigation expenses, already totalling more than $4 million (including over $775,000 for the state of Utah), could cost additional millions if these multifaceted controversies continued. In these circumstances, which posed serious threats to customers and shareholders as well as to the immediate parties, a negotiated settlement could resolve not only the immediate questions involved in the remand from this Court but also other related issues that threatened further controversy and delay. For example, the "oil properties" acreage directly involved in the remand from this Court totalled about 60,000 acres, whereas the unexplored leaseholds ultimately affected by the settlement agreement totalled about 1.4 million acres.

With the encouragement of the Commission, settlement negotiations began in March, 1981, in the midst of discovery proceedings in preparation for adversary hearings before the Commission. Negotiations were concluded the following October. Counsel for MFS and Wexpro represented the utility, and special counsel for the Division of Public Utilities represented the public agency and consumers. Staff counsel for the Public Service Commission of Wyoming (which later approved the agreement) also participated. The Commission later made this finding about these negotiations:

> It appears from the statement of counsel and testimony of witnesses that the parties to the Settlement vigorously pursued their positions; negotiations were extremely tough and at arms length.

The Commission also noted that the parties used "well-qualified and eminent experts in connection with decisions made and positions taken in negotiations."

The settlement, which the Commission approved after the hearings described hereinafter (Part III), had the following provisions:

1. *Gas wells.* MFS will retain ownership of producing gas wells and appurtenant facilities that historically have been accounted for in the MFS rate-base account 101. The natural gas, natural gas liquids, and oil produced from these "productive gas reservoirs" will belong to MFS and will be regulated by the Commission. The leaseholds and operating rights on these wells will be transferred to Wexpro, which will operate the wells and facilities on a service contract basis. In the first five years, Wexpro will spend a minimum of $40 million on developmental drilling on these reservoirs, which are not currently perforated by enough wells to produce all available gas. If a development well is unsuccessful, all of its costs will be borne by Wexpro. If it is successful, its cost will be capitalized in a manner similar to a ratebase account. The cost will include an amount equal to the base rate of return (calculated from returns received by a group of regulated utilities—currently 16%), plus an additional risk premium of 8% for investment in commercial development wells, both amounts to be paid to Wexpro. Natural gas produced from these wells will belong to MFS and will be delivered at cost-of-service prices. The proceeds from natural gas liquids and oil produced from these wells will be shared, after deduction of their proportionate share of expenses, including the base rate of return and a risk premium of 5%. Ratepayers will receive 54% of these proceeds (by Wexpro's payment to an MFS account to reduce natural gas rates), and Wexpro, 46%.

2. *Oil wells.* The productive oil reservoirs are the properties that were the main focus of controversy in *Wexpro I.* Their original cost was entered in MFS account 105, and most of the costs of their explora-

tion and development have been borne by ratepayers. In a settlement provision whose fairness and consistency with our mandate is hotly challenged in these petitions, the rights in the productive oil reservoirs were divided as follows. Wexpro will own and operate the properties and develop them at its own expense and risk. All natural gas produced will be sold to MFS at cost-of-service prices. The net profits from production of oil and natural gas liquids (from existing and future wells) will be calculated after allowing Wexpro to recover all expenses and the base rate of return and risk premium described earlier. The ratepayers will receive 54% of the net profits, and Wexpro, 46%.

3. *Exploratory properties.* Another settlement provision whose fairness and consistency with our mandate is contested on this appeal concerns the 1.4 million acres of exploratory properties. This "wildcat acreage" consists of unexplored formations underlying producing gas properties, productive oil reservoirs, and totally unexplored leases. Under the settlement, all leases are to be transferred to Wexpro or its assignee (Celsius), which will explore these properties at its sole risk and expense. The ratepayers will receive a 7% overriding royalty on all production (measured on gross revenue or production in kind). MFS also has the first right to purchase any natural gas at market price. The transfer of these leases will remove about $14 million from the MFS rate base, plus the annual cost of retaining this acreage, both of which will have immediate effect in reducing MFS rates.

4. *After-acquired properties.* On 128,-000 acres of unexplored property independently acquired by Wexpro between 1977 and 1979, and acreage in a field in San Juan County, Utah, neither of which was ever held in an MFS utility account, the ratepayers will receive a 2½% royalty and MFS has a first right to purchase natural gas at market price. (There is no provision for ratepayers with respect to other unexplored properties Wexpro acquired after January, 1977, or other acreage never capitalized in the MFS rate base.)

5. *Cash payments.* In the first year of the settlement, Wexpro will pay MFS $21 million to be applied to reduce rates charged its ratepayers, plus $250,000 per year for the succeeding twelve years for the same purpose.

In essence, the foregoing settlement resolves the pending disputes, including uncertainties over the extent of the MFS ratepayers' interest in the oil properties explored at their risk, by releasing the ratepayers' proprietary interest to MFS or its affiliates in exchange for their assuring the ratepayers an overriding royalty or a net profits interest in the oil and gas produced from these and other properties, and in consideration of the other agreements on cash payments and price and supply of natural gas.

## II.  JUDICIAL REVIEW OF COMMISSION FINDINGS AND CONCLUSIONS

At the outset, we need to clarify our standard or scope of review of the various types of Commission decisions brought before us in this proceeding. Since Utah has no administrative procedure act, we turn first to the statute governing judicial review of the decisions of the Public Service Commission on public utility matters, but we interpret that statute in the context of established principles governing judicial review of administrative agencies generally.

So far as pertinent here, U.C.A., 1953, § 54–7–16, which empowers this Court to review Commission decisions by writ of certiorari (petition for review), reads as follows:

[1] The review shall not be extended further than to determine whether the commission has regularly pursued its authority, including a determination of whether the order or decision under review violates any right of the petitioner under the Constitution of the United States or of the state of Utah. [2] The findings and conclusions of the commission on questions of fact shall be final and shall not be subject to review. [3]

Such questions of fact shall include ultimate facts and the findings and conclusions of the commission on reasonableness and discrimination.

Although the opinions of this Court—especially in earlier times—have sometimes spoken as if we had a single standard for review of all Commission findings and conclusions, that generalization does not withstand scrutiny today. The statute quoted above, the principles of judicial review of administrative agencies, and the whole range of this Court's opinions show at least three different standards of review for three different types of Commission decisions involved in the case before us.[7]

A. General Law—Correction of Error.

■ In reviewing the Commission's interpretations of general questions of law, this Court applies a correction-of-error standard, with no deference to the expertise of the Commission. General questions of law include interpretation of the United States Constitution and the Acts of Congress, and interpretation of the Utah Constitution and the Acts of the Legislature (except those defined below as special laws). This is the type of review specified in the first sentence of the statute quoted above, i.e., whether the Commission has "regularly pursued its authority" and whether it has violated any constitutional or statutory rights of the petitioner.

Examples of this correction-of-errors type of review include whether the Commission has complied with the fairness requirements of due process,[8] whether the Commission has acted beyond its statutory jurisdiction or authority,[9] and such questions of general law as the interpretation of contracts and certificates.[10] This is also the standard this Court applied in *Wexpro I* when it reversed the Commission's decision which in effect denied that the MFS ratepayers had any proprietary interest in the oil properties they had helped to finance and that the Commission lost its jurisdiction when those properties were transferred to Wexpro.

Correction of errors without deference to the expertise of the Commission is the standard this Court will follow in determining whether the Commission has departed from this Court's mandate on the remand from *Wexpro I* (Part III), and in determining the degree of finality or *res judicata* to be accorded to the Commission's decision in this matter (Part V).

In contrast to questions of general law, on which this Court acts without deference to the decision of the Commission because the Court has comparatively greater qualifications on these questions, in reviewing each of the other two types of questions this Court extends a degree of deference to the Commission because of its proximity and expertise.

B. Findings of Fact—Evidence of Any Substance Whatever.

The greatest degree of deference is extended to the Commission's findings on questions of basic fact (which do not include "ultimate facts" and the application of legal rules to basic facts, treated in section C).

7. See generally K. Davis, 4 Administrative Law Treatise, chs. 29–30 (1958 & Supp.1982); L. Jaffe, Judicial Control of Administrative Action, chs. 14–16 (1965); Jaffe, "Judicial Review: Question of Law," 69 Harv.L.Rev. 239 (1955); Abrahams, "Scope of Review of Administrative Action in Washington: A Proposal," 14 Gonzaga L.Rev. 75 (1978); Brodie & Linde, "State Court Review of Administrative Action: Prescribing the Scope of Review," 1977 Ariz.St. L.J. 537.

8. *Celebrity Club, Inc. v. Utah Liquor Control Commission*, Utah, 657 P.2d 1293 (1982); *R.W. Jones Trucking, Inc. v. Public Service Commission*, Utah, 649 P.2d 628 (1982); *Utility Consumer Action Group v. Public Service Commission*, Utah, 583 P.2d 605 (1978).

9. *Intermountain Health Care, Inc. v. Industrial Commission*, Utah, No. 18002, filed Dec. 6, 1982; *Utah Cable Television Operators Association, Inc. v. Public Service Commission*, Utah, 656 P.2d 398 (1982); *Utah State Board of Regents v. Utah Public Service Commission*, Utah, 583 P.2d 609 (1978); *Interwest Corp. v. Public Service Commission*, 29 Utah 2d 380, 510 P.2d 919 (1973).

10. *W.S. Hatch Co. v. Public Service Commission*, 3 Utah 2d 7, 277 P.2d 809 (1954).

Here we apply the scope of review specified in the second sentence of § 54–7–16, quoted above. While the statutory language "final and ... not ... subject to review" has not been interpreted literally to foreclose all judicial review of Commission findings of fact, it does preclude such review in most cases.

The words "arbitrary and capricious" have often been used to describe the circumstances in which this Court would upset Commission findings on questions of basic fact. Standing alone, these words are subject to the criticism that they are mere word formulas that give little guidance in defining the limited circumstances in which the reviewing court can upset the findings of the agency.[11] In this context, the words "arbitrary and capricious" are helpful only when they are combined with words describing some quantum of evidence. Thus, in *Williams v. Public Service Commission,* 29 Utah 2d 9, 13, 504 P.2d 34, 37 (1972), we held that Commission findings of fact will be upset by this Court only where they are *"so without foundation in fact"* that they "must be deemed capricious and arbitrary" (emphasis supplied). This high threshold of review provides less latitude for judicial review of Commission findings of basic facts than the "substantial evidence" standard specified in the Federal Administrative Procedure Act.[12]

There are other decisions to the same effect involving other questions and other agencies. Thus, in reviewing decisions on unemployment compensation under a statute essentially equivalent to § 54–7–16, we have declared that we will sustain the findings of the Industrial Commission if "there is *evidence of any substance whatever* which can reasonably be regarded as supporting the determination made ..." (emphasis supplied). *Kennecott Copper Corp. Employees v. Department of Employment Security,* 13 Utah 2d 262, 264–65, 372 P.2d 987, 989 (1962), reaffirmed in *Taylor v. Department of Employment Security,* Utah, 647 P.2d 1 (1982). Other cases to the same effect involving other administrative decisions are set out in the footnote.[13]

■ The standard of review that affirms Commission findings on questions of basic fact if they are supported by "evidence of any substance whatever" and sets them aside only if they are "without foundation in fact" is the standard this Court will follow in reviewing the Commission's findings of basic facts in this case. That includes its finding on the market value of the transferred assets (Part III).

C. Other Decisions—Reasonableness or Rationality.

Between the foregoing extremes of no deference on questions of general law and the greatest deference on questions of basic

---

**11.** *See* Brodie & Linde, *supra* note 7, at 550.

**12.** 5 U.S.C. § 706(2)(E) (1976). The substantial evidence standard does not allow as extensive a latitude for judicial review as the "clearly erroneous" test for reviewing the findings of a judge sitting without a jury. K. Davis, 4 Administrative Law Treatise, §§ 29.02 & 29.07 (1958). In turn, the "no basis in fact" standard enunciated in *Estep v. United States,* 327 U.S. 114, 122–23, 66 S.Ct. 423, 427–28, 90 L.Ed. 567 (1946), and *Dickinson v. United States,* 346 U.S. 389, 394, 74 S.Ct. 152, 156, 98 L.Ed. 132 (1953), allows even less latitude for review than the substantial evidence test, and in that respect is similar to the test propounded here. Davis explains the relationship in terms of what he called "the basic and universal understanding that of the three main formulas for review of findings of fact, the broadest judicial inquiry was under the clearly erroneous test,

the next broadest was under the substantial evidence test, and the narrowest was under the arbitrary or capricious test." K. Davis, Administrative Law of the Seventies, § 29.00 (1976).

**13.** *E.g., Kaiser Steel Corp. v. Monfredi,* Utah, 631 P.2d 888, 889–90 (1981) (workmen's compensation); *Mulcahy v. Public Service Commission,* 101 Utah 245, 249–50, 117 P.2d 298 (1942) (motor carrier certification).

Some cases apparently referring to the requirement of "substantial evidence" appear to be references to the reasonableness scope of review that is applied to the types of decisions treated in section C. *E.g., Utah Department of Business Regulation v. Public Service Commission,* Utah, 614 P.2d 1242, 1245–46 (1980) (natural gas rates); *Utah State Board of Regents v. Utah Public Service Commission,* Utah, 583 P.2d 609, 610 (1978) (electrical rates).

fact are a variety of issues on which Commission decisions are entitled to weight, but are subject to judicial review to assure that they fall within the limits of reasonableness or rationality. The existence of this intermediate category of issues is a pragmatic concession—born of experience—that the terms *law* and *fact* and the extent of judicial review associated with them have not provided the analytical framework to explain the various types of review actually exercised by the courts. As Judge Henry Friendly has said, "The common approach seeking to dichotomize all decisions as either 'law' or 'fact' is too simplisitic." *United States v. J.B. Williams Co.*, 498 F.2d 414, 431 (2d Cir.1974). Professor Kenneth C. Davis has even argued that law and fact are not analytical categories that dictate results, but only functional labels to signify what the courts choose to review and not to review.[14] In any case, practical experience with judicial review has unquestionably identified a major category of administrative decisions on which reviewing courts exercise a scope of review more extensive than when reviewing agency findings on questions of basic fact, but less extensive than when reviewing to correct error in agency decisions on questions of general law. *Salt Lake Corporation v. Department of Employment Security*, Utah, 657 P.2d 761 (1982).

A variety of different issues are governed by this intermediate standard. Most notably, they include what has been described as "mixed questions of law and fact" or the "application" of the findings of basic facts (*e.g.*, what happened) to the legal rules governing the case.[15] Also included are the types of issues treated in the third sentence quoted from § 54–7–16, referring to "ultimate facts and the findings and conclusions of the commission on reasonableness and discrimination." Such questions as these

are sometimes included within the Commission's "conclusions of law."

Also among these intermediate issues are the Commission's decisions on what can be called questions of "special law." These are the Commission's interpretations of the operative provisions of the statutory law it is empowered to administer, especially those generalized terms that bespeak a legislative intent to delegate their interpretation to the responsible agency. In reviewing agency decisions of this type, we apply what we have called the "time honored rule of law . . . that the construction of statutes by governmental agencies charged with their administration should be given considerable weight . . . ." *McPhie v. Industrial Commission*, Utah, 567 P.2d 153, 155 (1977); *West Jordan v. Department of Employment Security*, Utah, 656 P.2d 411 (1982).[16] An agency's interpretation of key provisions of the statute it is empowered to administer is often inseparable from its application of the rules of law to the basic facts, discussed above. In reviewing decisions such as these, a court should afford great deference to the technical expertise or more extensive experience of the responsible agency. *Salt Lake Corp. v. Department of Employment Security, supra; Central Bank & Trust Co. v. Brimhall*, 28 Utah 2d 14, 18, 497 P.2d 638, 641 (1972). But, on issues of special law, as with other issues under this heading, the decision of the Commission is subject to judicial review under the standard elucidated here.

The degree of deference extended to the decisions of the Commission on these intermediate types of issues has been given various expressions, but all are variations of the idea that the Commission's decisions must fall within the limits of reasonableness or rationality. As used in this context, the words "arbitrary and capricious" mean no more than this.

---

14. K. Davis, 4 Administrative Law Treatise, §§ 30.02–30.14 (1958).

15. *E.g.*, Davis, *supra* note 7, at §§ 30.01–30.05; *N.L.R.B. v. Marcus Trucking Co.*, 286 F.2d 583, 590–91 (2d Cir.1961) (Friendly, J.); Abrahams, *supra* note 7.

16. *See also, West Jordan v. Morrison*, Utah, 656 P.2d 411 (1982); *Wells Fargo Armored Service Corp. v. Public Service Commission*, Utah, 626 P.2d 450 (1981); *Springfield Education Association v. Springfield School District No. 19*, 290 Or. 217, 621 P.2d 547, 551–57 (1980) (Tanzer, J.).

The test of rationality may be simply a matter of logic or completeness, such as when the question is whether the Commission's findings of fact support its conclusion.[17] Similarly, the Commission's "selection of a particular course of action as a means toward achieving a known policy goal can be examined for rationality ...."[18]

■ When the decision being reviewed represents the agency's weighing of competing values to select a particular goal, its interpretation of a special law, or its application of its findings of fact to a finding or conclusion on the "ultimate facts" in the case, judicial review necessarily involves an independent judgment of the reasonableness of the agency decision. In these circumstances, reasonableness is measured against a specific standard: "The reasonableness of the Commission's order must be determined in light of the statutory setting in which it operates." *Milne Truck Lines, Inc. v. Public Service Commission,* 13 Utah 2d 72, 75, 368 P.2d 590, 592 (1962). Thus, reasonableness must be determined with reference to the specific terms of the underlying legislation, interpreted in light of its evident purpose as revealed in the legislative history and in light of the public policy sought to be served.

Such judicial review does not violate the oft-voiced principle that it is not this Court's prerogative to pass on the wisdom of the policy decisions of regulatory commissions.[19] Thus, in *PBI Freight Service v. Public Service Commission,* Utah, 598 P.2d 1352, 1354 (1979), we emphasized:

The Public Service Commission is charged with the duty of seeing that the public receives the most efficient and economical service possible. This requires consideration of all aspects of public interest ....

*Considerations of policy are primarily the responsibility of the Commission. It is well settled that this Court cannot substitute its judgment for that of the Commission ....* [Emphasis added.]

There is an obvious difference between a reviewing court's substitution of its own preferences for the policy judgments of a commission, which is forbidden, and a court's reviewing commission decisions to assure that they fall within the outer limits of reasonableness as measured by the statutory language, purpose, and policy, which is its proper function.

A particularly significant example of the application of the reasonableness standard is *Silver Beehive Telephone Co. v. Public Service Commission,* 30 Utah 2d 44, 512 P.2d 1327 (1973), where this Court set aside the Commission's revocation of a telephone company's authority to provide service to an area not otherwise served. In that case, the Court could find "no reasonable way of reconciling" the Commission's order with its statutory responsibility to see that the public has the best possible and most economical telephone service. *Id.* at 46, 512 P.2d at 1328–29. The Court's opinion omits the traditional "arbitrary or capricious" phraseology of the scope of review in favor of a statement that notwithstanding the language of finality in the statute and the presumed expertise of the Commission, judicial review "was not intended to be merely perfunctory ...." Instead, this Court's review

was intended to be a substantial and meaningful review for the purpose of giving correction and guidance when it appears that the actions of the Commission are *so clearly inconsistent with its purpose* of regulating utilities on behalf of the public interest and the utility involved *that they transgress the tolerable limits of reason.* [Emphasis added.]

---

17. *Mountain States Legal Foundation v. Utah Public Service Commission,* Utah, 636 P.2d 1047, 1057 (1981); *Williams v. Public Service Commission,* 29 Utah 2d 9, 504 P.2d 34 (1972).

18. Brodie & Linde, *supra* note 7, at 555.

19. *E.g., Utah Parks Co. v. Kent Frost Canyonland Tours,* 19 Utah 2d 252, 254, 430 P.2d 171, 172 (1967); *Lewis v. Wycoff Co.,* 18 Utah 2d 255, 259, 420 P.2d 264, 266 (1966); *Mulcahy v. Public Service Commission,* 101 Utah 245, 256, 265, 117 P.2d 298, 302, 306 (1941).

*Id.* at 46, 512 P.2d at 1328; *Utah State Board of Regents v. Utah Public Service Commission,* Utah, 583 P.2d 609, 610 (1978).

Similarly, in reversing a Commission order denying a certificate of convenience and necessity even though the Commission had found that there was an unfulfilled public need for the proposed service, this Court explained:

> The significant point in this case is that the plaintiff's attack is not upon the findings of the Commission. On the contrary, he himself places reliance upon the findings. His argument is that he is entitled to application of the rule that if the only reasonable conclusion to be deduced from the findings would be to grant his application, then the refusal was capricious and arbitrary and should be reversed. With that proposition we agree. ... [I]f on the basis of the Commission's findings, its action is *so unreasonable that it must be deemed capricious and arbitrary,* it should not be sustained.
>
>      \*     \*     \*     \*     \*     \*
>
> ... [W]e fail to see *any basis in reason* for the order denying plaintiff's application. Accordingly, it is reversed. [Emphasis added.]

*Williams v. Public Service Commission,* 29 Utah 2d 9, 11, 14, 504 P.2d 34, 36, 38 (1972). Other decisions of this Court reversing other agency actions that have been found to fall outside the limits of reasonableness are cited in the footnote.[20] Decisions sustaining the Commission on the basis that its findings and conclusions were within the limits

of reasonableness are cited in the footnote.[21]

These authorities dictate our scope of review on the question whether the proposed settlement between MFS and the Division of Public Utilities is consistent with the public interest (Part IV). Considerations of policy being primarily the responsibility of the Commission, *PBI Freight Service v. Public Service Commission, supra,* we give great weight to its conclusions on matters of this nature, and set its decision aside only if it is outside "the tolerable limits of reason," *Silver Beehive Telephone Co. v. Public Service Commission, supra,* or "so unreasonable that it must be deemed capricious and arbitrary." *Williams v. Public Service Commission, supra.*

## III. COMMISSION PROCEEDINGS ON REMAND

This Part concerns whether the terms of our remand order in *Wexpro I* permitted the parties to negotiate a settlement that the Commission could approve without a *de novo* determination of the principal factual premises upon which it was based. Citing the obvious proposition that an inferior tribunal must conform to the mandate of a superior court, *Powerine Co. v. Zion's Savings Bank & Trust Co.,* 106 Utah 384, 148 P.2d 807 (1944); *Briggs v. Pennsylvania Railroad Co.,* 334 U.S. 304, 306, 68 S.Ct. 1039, 1040, 92 L.Ed. 1403 (1948), the Department and the Coalition contend that the settlement violated this Court's mandate in *Wexpro I* in four respects:

---

20. *West Jordan v. Department of Employment Security,* Utah, 656 P.2d 411 (1982) (reversing Commission interpretation of statutory term "remuneration" as "contrary to the evident purpose of the statute" and "outside the permissible range of the Commission's discretion"); *Northwest Carriers, Inc. v. Industrial Commission,* Utah, 639 P.2d 138 (1981) (increasing Commission allocation of relative responsibility of Second Injury Fund pursuant to purpose and language of Act); *Farmers Grain Cooperative v. Mason,* Utah, 606 P.2d 237 (1980) (reversing workmen's compensation award because Commission determination that "accident" included progressive disability without trauma was contrary to terms and purpose of statute).

21. *PBI Freight Service v. Public Service Commission,* Utah, 598 P.2d 1352 (1979); *Empire Electric Association, Inc. v. Public Service Commission,* Utah, 604 P.2d 930 (1979) (provision of electric power outside certificated area); *Utah Parks Co. v. Kent Frost Canyonland Tours,* 19 Utah 2d 252, 430 P.2d 171 (1967) (modification of motor carrier authority); *Utah Gas Service Co. v. Mountain Fuel Supply Co.,* 18 Utah 2d 310, 422 P.2d 530 (1967) (extension of gas service to additional community); *Lewis v. Wycoff Co.,* 18 Utah 2d 255, 420 P.2d 264 (1966) (modification of motor carrier authority on basis of Commission's assessment of "public need").

(1) The ratepayers did not get all of the profits from the properties (595 P.2d at 876);

(2) The Commission's order allows MFS's shareholders to operate two unregulated oil companies as wholly owned subsidiaries (Wexpro and Celsius) (*id.* at 878 n. 8);

(3) The Commission failed to determine whether the properties in question were utility assets in accordance with the tests set forth by the Court (*id.* at 878);

(4) The Commission failed to hold a hearing and make an independent determination of the market value of the assets in which the ratepayers had an interest (*id.*).

■ The short answer to the first argument is that this Court did not require that the ratepayers receive *all* of the net profits from the properties in which they had a proprietary interest. The Court's statement that the ratepayers were the "primary" source of risk capital for the exploration of these properties,[22] and the statement that the ratepayers "were entitled to share in the benefit," 595 P.2d at 876, do not add up to a ratepayers' vested right to all of the net profits from production on these properties. The extent of the interest the ratepayers would receive was subject to negotiation and inclusion in a package, as was done.

The second argument will be discussed in Part IV of this opinion.

The third and fourth arguments challenge the Commission's power to approve a settlement that resolves the disposition of the contested properties by negotiation rather than by the process contemplated in the Court's opinion: determining whether particular properties were "utility assets" according to three specified criteria, and, if so, determining their market value in order to protect the ratepayers' interests. The Department and the Coalition characterize the Commission's action in approving the settlement as a deviation from this Court's

mandate that is fundamentally repugnant to the judicial process of the State—an affront that threatens the maintenance of respect for the Court's decisions.

The Commission, on the other hand, obviously saw the negotiated settlement as a means of resolving not only the questions remanded from this Court, but also other important controversies whose speedy and economical resolution would serve the public interest. Thus, in its findings of fact, the Commission "accepts the Stipulation and Agreement as [a] means of dealing with the 'Wexpro' case and related matters," and finds that "[r]esolution of the many issues involved in this proceeding and the related pending litigation is in the public interest." In that context, the Commission's order concludes that the Commission has "jurisdiction to resolve cases before it on the basis of a negotiated settlement," and that the settlement "resolves the disputes between the parties and the issues of the remanded case in a reasonable and lawful manner that is consistent . . . with the opinion of the Utah Supreme Court in [*Wexpro I*]."

As noted in Part IIA herein, the question of whether the Commission has departed from our mandate is a question of general law, which we determine without weight to the decision or deference to the expertise of the Commission.

■ The law has no interest in compelling all disputes to be resolved by litigation. *International Motor Rebuilding Co. v. United Motor Exchange, Inc.,* 193 Kan. 497, 499, 393 P.2d 992, 995 (1964); *Lomas & Nettleton Co. v. Tiger Enterprises, Inc.,* 99 Idaho 539, 542, 585 P.2d 949, 952 (1978). One reason public policy favors the settlement of disputes by compromise is that this avoids the delay and the public and private expense of litigation. The policy in favor of settlements applies to controversies before regulatory agencies,[23] so long as the

---

**22.** MFS provided all the acquisition cost for the contested properties, and since 1972 has paid a share of the exploration costs.

**23.** The public policy in favor of settlement was recognized in (though it did not originate with)

settlement is not contrary to law and the public interest is safeguarded by review and approval by the appropriate public authority. *Pennsylvania Gas & Water Co. v. Federal Power Commission,* 463 F.2d 1242 (D.C. Cir.1972); *Continental Oil Co. v. Federal Power Commission,* 373 F.2d 96 (10th Cir. 1967).

■ The policy in favor of settlements also applies to cases remanded by appellate courts, even though settlements in this circumstance invariably involve some deviation from the course of events contemplated in the mandate. If that deviation were considered an affront to the reviewing court, the policy favoring settlements would be frustrated. In this circumstance, the important consideration is not whether the settlement deviates from the process contemplated in the mandate, but whether the terms of the settlement achieve the result sought to be achieved by the mandate.[24] In addition, where the controversy involves public regulation, the settlement must be consistent with the public interest. That question is addressed in Part IV of this opinion.

■ The result sought to be achieved by the Court's mandate concerning the determination of "utility assets" and "fair market value" was clearly stated in *Wexpro I:* "so an appropriate benefit [from any transfer] will redound to the credit of the ratepayers." 595 P.2d at 878. We conclude as a matter of law (Part IIA) that whether the stated goal has been achieved is a question to be resolved by the Commission, which could do so either by hearing witnesses and reaching its decision in an adversary proceeding or by reviewing the outcome of highly adversary and good faith negotiations between the parties.[25]

The Commission's findings on the questions pertaining to the market value of the transferred properties and benefits to ratepayers are as follows:

The Settlement will allow the properties to be explored and developed to the benefit of all parties. The interests of MFS and its customers in benefits from the properties are protected and realized in the Settlement. The transfer of properties is for fair market value as that value is typically determined in the industry. Adequate benefits from the Settlement redound to the benefit of customers of MFS.

There is abundant evidence to support those findings—ample to satisfy the scope of review described in Parts IIB and C of this opinion for questions of basic fact like market value and for questions of application like benefits to ratepayers. For example, every witness who testified on this subject affirmed that a production royalty was the accepted means of valuing interests in unexplored oil and gas properties, that 7% was a fair figure in the circumstances, and that the overall settlement was fair to the ratepayers.[26] The Department's *argument* that the settlement was not a reliable measure

---

1981 legislation specifically authorizing the Public Service Commission to adopt a settlement negotiated between the parties to a controversy before it. U.C.A., 1953, § 54–7–10(1).

**24.** In order to provide threshold assurance of the fairness of its terms, the settlement must also be the result of arm's length bargaining in good faith. That important requirement is not discussed further at this point because the Commission found compliance with it, and no one questions that finding.

**25.** Since the parties' settlement assumed that all the properties in question were utility assets, the result contemplated by the mandate was obviously achieved as to that requirement, without Commission determination.

**26.** Earlier in its order, the Commission had explained that

the 7% overriding royalty associated with exploratory properties was deemed by Messrs. Roseman, Ritzma and Hale for the Division and Committee, to be fair market value for those assets. The Commission accepts this expert testimony. Witnesses testified that because of the speculative nature of evaluating unexplored properties, they are typically traded in the industry on the basis of retained interests such as royalty interests. These properties already have on average 16% in [landowners'] royalties; hence, 7% is a figure that could well have been reached in a typical industry transaction. The Company's right to receive gas at cost of service and 54% of net profits from liquids produced on the productive oil properties transferred to

of market value because it was coerced by the prospects of continued litigation is not *evidence* of that fact, and, not being supported by evidence presented to the Commission, could not be a basis for upsetting the Commission's findings in any case.

Since—as decided by the Commission—the settlement achieves the result sought by the Court's mandate, the Commission's deviation from the process contemplated in the mandate was appropriate. This is especially true because the public authority empowered to regulate and "supervise all of the business" of a public utility, U.C.A., 1953, § 54-4-1, is the Commission, not this Court. *Mountain States Telephone & Telegraph Co. v. Public Service Commission,* 107 Utah 502, 510-12, 155 P.2d 184, 187-88 (1945). The mandate we issue in a particular case does not displace that statutory division of responsibility. The Commission is not an automaton, free only to act as programmed by the mandate of the reviewing court. Especially in the circumstances of this case, where the settlement resolves not only the case remanded to the Commission but also other pending controversies and problems posed by subsequent events, the mandate does not prevent the Commission from "enforcing the legislative policy committed to its charge." *F.C.C. v. Pottsville Broadcasting Co.,* 309 U.S. 134, 145-46, 60 S.Ct. 437, 442-43, 84 L.Ed. 656 (1940); *N.L.R.B. v. Food Store Employees Union,* 417 U.S. 1, 9-11, 94 S.Ct. 2074, 2079, 2080, 40 L.Ed.2d 612 (1974). Consistent with that principle, the Commission has the latitude to approve a settlement resulting from arm's length bargaining in good faith, whose terms are consistent with the result sought to be achieved by the mandate of the reviewing court and in the public interest.

## IV. SETTLEMENT IN PUBLIC INTEREST?

A. In General.

After the parties submitted their stipulation and agreement of settlement, the Commission held eight days of hearings to receive testimony and public statements on whether it should be approved. The Commission heard from qualified accountants, economists, petroleum engineers, energy and utility rate consultants, petroleum geologists, security analysts, shareholders, officers of MFS and Wexpro, an Assistant Attorney General, and from public witnesses, including ratepayers. After widely publicized hearings on October 14-16 and 19-20, 1981, the Commission continued the matter to November 23-25 to allow further opportunity for the public to examine and comment on the settlement and for the Coalition to prepare any evidence it wished to offer.

During the course of its hearings, the Commission heard testimony from 12 witnesses and received written submissions from 10 other persons and organizations. The parties' witnesses supported the fairness of the settlement, examining and commenting upon its various provisions in great detail and recommending that the Commission approve it as being in the public interest. Although the Coalition opposed the settlement, its single witness took no position on the merits of the settlement. The testimony of public witnesses expressed concerns about various provisions of the settlement, focusing principally on utility rates.

In an order entered December 31, 1981, the Commission found that "[t]he interests of MFS customers, of citizens of the State of Utah and of MFS shareholders will be served by approval of the Settlement." The Commission concluded "that the transfer is for market value, that [it] is in the public interest and that appropriate benefits redound to the benefit of the customers and MFS."

■ Our statutes direct in the clearest terms that the agency "vested with power

Wexpro was deemed by all expert witnesses who addressed the issue to be fair market

consideration for those properties.

and jurisdiction ... to supervise all of the business of every such public utility in this state" is the Commission, not this Court. U.C.A., 1953, § 54–4–1. The Commission is empowered to assure that utility charges and rules and regulations are "just and reasonable" and that service is "adequate, efficient, just and reasonable." U.C.A., 1953, § 54–3–1. As noted in Part IIC of this opinion, the decisions of this Court establish that determinations of policy on subjects within the Commission's jurisdiction and expertise are primarily the responsibility of the Commission. Pursuant to the foregoing statutes and decisions, the Commission clearly has the authority to determine whether the proposed settlement is in the public interest.

■ On a matter such as this, this Court's scope of review is limited to determining whether the Commission's conclusion falls within the limits of reasonableness when measured against the terms of the authorizing legislation, its evident purpose, and the public policy it seeks to serve. After viewing the question in that manner, we are fully satisfied that the Commission's approval of this settlement does not "transgress the tolerable limits of reason." *Silver Beehive Telephone Co. v. Public Service Commission,* 30 Utah at 46, 512 P.2d at 1328, discussed in Part IIC herein.

The settlement brings an end to a complex, divisive, and expensive public controversy. Its fairness is confirmed by the unquestioned adversary nature of the negotiations, by the skill of the parties and their counsel, and by the Commission's finding of market value, which we have already sustained. The settlement forestalls further delay in exploring the wildcat acreage, which would entail forfeitures or other losses detrimental to all parties. It permits MFS and its affiliates to proceed with the exploration and development of its mineral resources, to the advantage of all parties. It permits the corporations and public agencies to proceed with planning free from the risks and uncertainties engendered by this long-standing and far-reaching controversy.

As additional advantages to the ratepayers, the settlement assures that they will continue to receive gas from the existing productive oil and gas reservoirs at cost-of-service prices (rather than the much higher market prices that could have resulted from the assertion of federal jurisdiction).[27] The settlement guarantees that gas rates will be reduced by credits for a majority of the profits from the oil properties. It also furthers ratepayer interests by obligating MFS (without any financial risk or additional investment by ratepayers) to conduct a vigorous exploration of properties in which ratepayers have a substantial royalty interest. It provides ratepayers a royalty interest in extensive "after-acquired properties" in which they had no investment or previous proprietary interest. The settlement also assures that the ratepayers will have first call to purchase natural gas (at market prices) from the vast wildcat acreage. Finally, it provides ratepayers an immediate rate reduction of $21 million plus amounts attributable to the removal of unexplored properties from the rate base (which the Division of Public Utilities estimates at about $2 million annually), and lesser reductions on a regular basis in the future.

Singling out various aspects of the settlement for individual examination and criticism, the Department urges their inconsistency with the interests of ratepayers and the public. For example, the Department attacks the provisions that permit Wexpro to sell some gas to MFS at market prices rather than cost-of-service prices, characterizing this feature as "a half billion dollar mistake" in its ultimate imposition of added costs on ratepayers. Since the Department did not appear and submit evidence for the consideration of the Commission, such factual-based argument is unpersuasive in this petition for review. A Commission finding and conclusion on the overall fairness of a

27. Referring to the possible assertion of jurisdiction by the Federal Energy Regulatory Commission, discussed Part I *supra,* the Division of Public Utilities states: "Protection of low-cost gas against the imposition of significantly higher NGPA prices by the FERC in the Agreement and Stipulation was a hard-won and important concession to the ratepayer."

negotiated settlement agreement containing many provisions should not be open to after-the-fact selective sniping at the fairness of individual provisions considered in isolation.

The Department also attacks the settlement provisions (not summarized earlier) by which the parties stipulate that none of them will "claim that the Properties owned by Wexpro are subject to the public utility regulation of any state," and by which they, in effect, express the hope that "Wexpro should be recognized by states in which it operates" as an independent company "which is not subject to state public utility regulation . . . ." The Department characterizes these provisions, and others related to them, as plainly unlawful terms that divest the Commission of its jurisdiction over the public utility properties transferred to Wexpro and Celsius, over the sale of natural gas from them to MFS, and over the activities of those affiliates in general. In the Department's view, these stipulations also divest the Commission of the power to determine "the serious issue," identified in *Wexpro I*, of "whether it is in the public interest for Mountain Fuel to divide its utility function between itself and a subsidiary." 595 P.2d at 878, n. 8.

The Commission thought otherwise. On the last issue, its order states that the Commission is "vitally interested in company restructuring which is in effect diversification or functional separation" and asserts that it is authorized to set aside or modify the same if "found to be detrimental to the utility cornerstone" of MFS's business or "injurious to the public interest." The Commission also concluded that "[b]y adopting and approving the Stipulation [which the Commission elsewhere characterized as merely "an agreement between the parties"], the Commission does not relinquish or limit any jurisdiction or statutory authority it possesses." The Commission also explained that notwithstanding any language that might be construed to the contrary in any of the settlement documents, "all parties have agreed on the record that acceptance of the settlement by the Commission in no way limits or affects the

Commission's jurisdiction or regulatory authority and further is not to be construed as limiting the Commission in its future regulation of MFS."

We find no error in the Commission's conclusions on these important jurisdictional matters (Part IIA). Like the Commission, we find no inconsistency between these conclusions and the parties' stipulation that none of them would claim that the "Properties" were subject to public utility regulation, since the quoted term is defined to refer solely to the properties MFS transferred to Wexpro and Celsius pursuant to the settlement. As to these "Properties" (and the related agreements on pricing and payments), the terms of the MFS-Wexpro (or Celsius) relationship, as approved by the Commission in the exercise of its jurisdiction, are fixed as a matter of property and contract law. The Commission's jurisdiction is otherwise unaffected by the agreement and stipulation or by the order approving it.

The Department also claims that the parties' stipulation "not to challenge any action taken by [MFS] or Wexpro in accordance with the terms of the Agreement other than through [the agreed] arbitration procedures," constitutes an illegal divestiture of the Division of Public Utilities' statutory powers to act as a party litigant before the Commission. Since that restriction on the powers of the Division of Public Utilities only applies to the enforcement of the agreement and to the "Properties" transferred under it, we think it is not illegal. The parties stipulated that the Division was "to monitor the performance of [MFS] and Wexpro under the Agreement" and they established means (including access to information) to facilitate that monitoring. Since the sound policy of the law looks with favor on agreements to arbitrate, *Lindon City v. Engineers Construction Co.*, Utah, 636 P.2d 1070 (1981), we can see no reason why that favoritism should not permit the parties to agree that the Division could enforce this limited function by means of arbitration.

**B. Measures of Utility Responsibility.**

■ Contrary to other Department arguments, the Commission's order is not illegal because of inconsistency with Utah law, notably those passages in the *Wexpro I* opinion that speak of MFS's "trust relationship" with ratepayers and of the no-profits-to-affiliates rule.

This Court's references to MFS's "trust relationship to its customers," 595 P.2d at 874 and 876, have been productive of considerable confusion.[28] The single judicial authority cited for this reference unquestionably used those words not in the technical sense of property owned in trust for another, but in the nontechnical sense of special responsibilities owed to another. Thus, in the two sentences immediately preceding its reference to "trust relationship" the cited case refers to the utility's monopoly position and to its consequent duty "to operate in such manner as to give to the consumers the most favorable rate reasonably possible." *City of El Dorado v. Arkansas Public Service Commission,* 235 Ark. 812, 816, 362 S.W.2d 680, 683–84 (1962). That statement, which was echoed in this Court's opinion in connection with each of its references to the "trust relationship," is simply an expression of the utility's legal responsibility to make "just and reasonable" charges for its services and to assure that those services are "in all respects adequate, efficient, just and reasonable." U.C.A., 1953, § 54–3–1. These and the related traditional legal duties of a utility— not a technical "trust relationship"—are the measure of the utility's relationship to its customers.

This clarification is not intended to minimize the extent of MFS's duties to its customers. Those duties are extensive, and they are enforceable. The Commission is empowered to "supervise and regulate every public utility in this state, and to supervise all of the business of every such public utility," § 54–4–1, including the fixing of rates. U.C.A., 1953, § 54–4–4. We have often said that the Commission is responsible to exercise its statutory powers over utilities to assure "that the public receives the most efficient and economical service possible." *Lewis v. Wycoff Co.,* 18 Utah 2d 255, 259, 420 P.2d 264, 266 (1966). The fixing of rates presupposes "efficient and economical management." *Utah Power & Light Co. v. Public Service Commission,* 107 Utah 155, 212, 152 P.2d 542, 568 (1944). Although the Commission is normally forbidden from intruding into the management of a utility, we have suggested that it can do so where "the policy and consequent expenditure is actuated by bad faith, or involves dishonesty, wastefulness, or gross inefficiency." *Logan City v. Public Utilities Commission,* 77 Utah 442, 447, 296 P. 1006, 1008 (1931).[29] These powers are surely sufficient for the Commission to ascertain and correct wasteful or grossly inefficient business practices by utilities in order to enforce what *Wexpro I* referred to as "the duty of a public utility corporation to operate in such a manner as to give to the consumers the most favorable rate reasonably possible." 595 P.2d at 874 and 876.

In addition to its general legal responsibilities as a utility, MFS assumed additional

---

**28.** The trust characterization is criticized in "Alice's Adventures in Wexpro-land: An Analysis," 2 J. Energy L. & Pol'y 237, 239–40 (1982).

**29.** Decisions requiring utility commissions to protect ratepayers from utility expenditures or practices deemed wasteful or clearly inefficient include *Colorado Municipal League v. Public Utilities Commission,* 172 Colo. 188, 195–204, 473 P.2d 960, 963–67 (1970), and *State ex rel. Utilities Commission v. Morgan,* 277 N.C. 255, 177 S.E.2d 405 (1970). *See generally,* M. Farris & R. Sampson, Public Utilities: Regulation, Management, and Ownership 94–99 (1973); Pontz & Sheller, "The Consumer Interest—Is It Being Protected by the Public Utility Commission?" 45 Temple L.Q. 315, 331–35 (1972);

Comment, "Rates Follow Service: The Power of the Public Utility Commission to Regulate Quality of Service," 28 Baylor L.Rev. 1137, 1145–50 (1976).

This Court has sustained the Commission's exercise of its powers to avoid wasteful utility practices in two cases where the Commission approved the provision of electrical power and gas by an outside utility that could provide the service with materially less capital expenditure than the utility in the relevant service area. *Empire Electric Association, Inc. v. Public Service Commission,* Utah, 604 P.2d 930 (1979); *Utah Gas Service Co. v. Mountain Fuel Supply Co.,* 18 Utah 2d 310, 422 P.2d 530 (1967).

responsibilities of a fiduciary character when it obtained ratepayer financing for utility exploration and development by including such expenses in its rate base. The resulting proprietary interest of ratepayers in MFS properties so financed, recognized in *Wexpro I,* might be termed a trust relationship. Whatever uncertainty exists on that score is finally resolved in the current settlement, under which the ratepayers have relinquished that proprietary interest in exchange for a royalty interest in a specific and larger quantity of properties, plus other considerations.

C.   No-Profits-to-Affiliates Rule.

In *Wexpro I,* we referred to the market-price-purchase terms of the original exploration agreement as a violation of the no-profits-to-affiliates rule. 595 P.2d at 874–75. We cited three authorities for that proposition: *Utah Power & Light Co. v. Public Service Commission,* 107 Utah 155, 195–96, 152 P.2d 542, 560–61 (1944); *Cities Service Gas Co. v. Federal Power Commission,* 424 F.2d 411 (10th Cir.1969); *Florida Gas Transmission Co. v. Federal Power Commission,* 362 F.2d 331 (5th Cir.1966). Those same three authorities (along with our decision in *Wexpro I* ) are now urged as a basis to upset the settlement provisions allowing Wexpro to charge MFS market price for gas produced on wells yet to be discovered on the exploratory properties and to retain a share of profits from the productive oil reservoirs. In *Utah Power & Light Co. v. Public Service Commission, supra,* this Court held that the Public Service Commission's application of a no-profits-to-affiliates rule was not arbitrary. In that case, the Commission disallowed from the utility's rate base a 3¼% profit fee that had been added to construction costs (including overhead) by an affiliate that the Court described as "a 'dummy' corporation organized without substantial assets of its own to do construction work for the parent corporation . . . ." 107 Utah at 193, 152 P.2d at 559.

MFS and the Division of Public Utilities attempt to distinguish the cited authorities from the current case, principally on the basis that Wexpro, though a wholly owned subsidiary, is not a shell corporation, but has substantial assets, personnel, and independent functions of its own, and that MFS's proposed purchases at market price are not subject to the internal abuse sought to be avoided by the no-profits-to-affiliates rule. They cite two authorities: *Washington Water Power Co. v. Idaho Public Utilities Commission,* 101 Idaho 567, 617 P.2d 1242 (1980); *Central Telephone v. State Corporation Commission,* 219 Va. 863, 252 S.E.2d 575 (1979).

The application of the no-profits-to-affiliates rule to rates charged by public utilities is a complex subject on which courts and commissions have taken quite diverse positions on differing sets of facts. *See generally Annot.,* 16 A.L.R. 4th 454 (1982). Following the precedent of the *Utah Power & Light Co.* case, *supra,* we think this subject is best treated in the first instance by the Public Service Commission, subject to our normal scope of review. In this case, the Commission has approved market-price purchases from an affiliate in the limited circumstance of gas produced on certain acreage included in the current settlement. In the context of that settlement, which resulted from adversary negotiations including the Division of Public Utilities, the terms of this purchase within the affiliate relationship have none of the "sweetheart" characteristics that the rule sought to counteract. We therefore have no difficulty in sustaining the Commission's approval of the market-price provisions of the settlement as within "the tolerable limits of reason" (Part IIC). We express no opinion on the applicability or inapplicability of the no-profits-to-affiliates rule in other circumstances.

## V.   FINALITY OF COMMISSION'S ORDER

This issue is posed by the Shareholders Association. They argue that the paramount purpose of the parties' agreement and stipulation was to resolve the pending controversies with a finality that would

permit MFS and its affiliates to raise the necessary investor capital and proceed with the exploration and development of the properties. They say this requires that the Commission order be *res judicata; that is,* that it be "rendered in a fashion that it cannot be modified or repealed by the present Commission or future Commissions." Deeming the order deficient in that respect, the Shareholders Association asks this Court to set aside the Commission's order and remand the case with directions for the Commission to enter a new order approving the parties' settlement agreement "with *res judicata* finality."

At the opposite extreme, the Department argues that the Shareholders are seeking an advisory opinion, since this case poses no real and present controversy on the *res judicata* effect of the Commission's order. Consequently, the Department concludes, this Court cannot now provide "a declaration that the order is *res judicata* and precludes a future Commission from redetermining the issues involved in this appeal."

Between these two extremes, the parties to the settlement agreement, MFS, Wexpro, and the Division of Public Utilities, defend the Commission's findings and conclusion on this point, which they say guarantee an appropriate degree of finality without compromising the Commission's jurisdiction.

The Commission's conclusion of law on this subject was as follows:

6. The Commission's findings and conclusions with regard to the transfer of properties and the allocation of benefits contemplated by the Settlement, including the findings and conclusions that the transfer of properties and the allocation of benefits are reasonable and for market value and are in the public interest, *are intended by the Commission to be final and not subject to future change* (except through an appropriate and timely petition for rehearing or judicial review).

The Commission so concludes because to insure the proper development of said properties *the parties must be able to rely on the finality of the findings and conclusions in regard to the transfer of properties and apportionment of benefits.* The Commission [is] also entitled to rely on the finality of its order. [Emphasis added.]

While endorsing the propriety of conclusion 6, the Shareholders object that earlier provisions of the Commission's order introduced such confusion and uncertainty on the *res judicata* effect of the order that they made conclusion 6 "illusory." Specifically, they refer to the Commission's "statements of philosophy" (1) that it could review and modify any proposed company restructuring of MFS if found detrimental to its functions as a utility or injurious to the public interest,[30] and (2) that it could require continued scrutiny to, in effect, protect MFS's customers from the effects of "conflict of interest or sweetheart relationship within the structure of MFS and all of its subsidiaries whether or not they are subject to a regulated rate of return." The Shareholders also complain of the Commission's conclusion of law (and related factual findings) that "[b]y adopting and approving the Stipulation, the Commission does not relinquish or limit any jurisdiction or statutory authority it possesses," and the related conclusion that the Commission can "require information from the parties and [can] investigate transactions under the Settlement in which the parties are involved."

We find no error in the Commission's conclusions on finality and *res judicata* (Part IIA). In common with the Commission and the parties to the settlement, we see no inconsistencies in the provisions to which the Shareholders object, each of which is essential to the viability of the

---

30. In relation to this, the Shareholders also complain of the Commission's finding of fact that MFS cannot escape its status as a regulated public utility by organizing itself into different corporate entities, parent and subsidiary in nature, and that by approving the settlement the Commission does not give up its "necessary access to information from the parent or its subsidiaries," or the Commission's "lawful regulatory control over MFS or any of its parts . . . ."

settlement and to the continued performance of the Commission's vital functions.[31]

■ In contrast to the lack of finality that exists as to orders fixing public utility rates,[32] the principles of *res judicata* apply to enforce repose when an administrative agency has acted in a judicial capacity in an adversary proceeding to resolve a controversy over legal rights and to apply a remedy. *United States v. Utah Construction & Mining Co.*, 384 U.S. 394, 421–22, 86 S.Ct. 1545, 1559–60, 16 L.Ed.2d 642 (1966); *Bowen Trucking, Inc. v. Public Service Commission*, Utah, 559 P.2d 954, 957 (1977) (Crockett, J., concurring); *Mulcahy v. Public Service Commission*, 101 Utah 245, 254–56, 117 P.2d 298, 302 (1941); *Philadelphia Electric Co. v. Borough of Lansdale*, 283 Pa.Super. 378, 424 A.2d 514, 521 (1981). *See generally*, 2 K. Davis, *Administrative Law Treatise* §§ 18.02, 18.08 (1958). Orders entered by consent or stipulation of the parties can be acts in a judicial capacity for this purpose. *Pope v. United States*, 323 U.S. 1, 12, 65 S.Ct. 16, 22, 89 L.Ed. 3 (1944).

■ In this case, the principle of *res judicata* assures finality to those provisions of the Commission's order that allocate benefits and establish the parties' rights (*e.g.*, royalties and net profits interests and financial commitments for sale of gas and for development and rate-reduction payments) in the properties transferred under the order or designated for exploration or development under it. Specific findings on finality are unnecessary to that result. Conversely, the finality that is inherent in the Commission's performance of the judicial function in approving the settlement is not compromised by the Commission's simultaneous affirmance of the obvious principle that by doing so it is not relinquishing its regulatory authority over the parties in the performance of those functions that are subject to the jurisdiction of the Commission.[33]

The Commission orders challenged in these petitions for review are all affirmed.

HALL, C.J., HOWE and DURHAM, JJ., and BRYANT H. CROFT, District Judge, concur.

STEWART, J., having disqualified himself, does not participate herein.

CROFT, District Judge, sat.

---

**31.** There is no anomaly in the combination of finality in respect to the resolution of a particular controversy, combined with continuing regulatory jurisdiction over the parties, even as to the future resolution of related questions left open in the settlement. Administrative bodies routinely retain continuing regulatory jurisdiction despite having resolved some connected issues with finality. *E.g., Christensen v. Industrial Commission*, Utah, 642 P.2d 755 (1982); *Salt Lake City v. Industrial Commission*, 61 Utah 514, 215 P. 1047 (1923) (industrial injuries).

**32.** *Utah State Board of Regents v. Public Service Commission*, Utah, 583 P.2d 609, 610–11 (1978).

**33.** The exact limits of Commission authority on such questions as whether or the extent to which a wholly owned subsidiary engaged exclusively in exploration and development could lawfully be subject to Commission regulatory authority as to properties other than those embodied in this settlement remain for resolution in future proceedings. While it is appropriate to confirm the finality of the financial benefits and property rights provisions in this settlement, an attempt to resolve all questions of Commission jurisdiction to regulate Wexpro or Celsius operations that significantly impact the regulated activities of their parent corporation in this state would be an impermissible advisory opinion.