**SAVAGE BROTHERS,
INCORPORATED,
Plaintiff,**

**v.**

**PUBLIC SERVICE COMMISSION OF
UTAH and Uintah Freightways,
Defendants.**

**No. 20253.**

Supreme Court of Utah.

Aug. 5, 1986.

Lon Rodney Kump, Salt Lake City, for plaintiff.

David L. Wilkinson, Atty. Gen., James L. Barker, Asst. Atty. Gen., Rick L. Hall, Salt Lake City, for defendants.

DURHAM, Justice:

This case is before this Court on writ of certiorari[1] which requests that we review a Public Service Commission ("the Commission") report and order[2] requiring Savage Brothers, Inc. ("Savage"), to cease and desist in its transportation of barite. In addition, the Commission ordered Savage to submit copies of its records to the Division of Public Utilities so that the Division could make recommendations for sanctions against Savage. The decision of the Commission involves its interpretation of a certificate of convenience and necessity previously issued to Savage by the Commission.

Uintah Freightways ("Uintah") instigated the proceedings before the Commission by filing a complaint that alleged that Savage did not have the authority to transport barite. Both Uintah and Savage are common carriers of property in intrastate commerce in Utah, and each holds several certificates of authority issued by the Commission. One of the certificates held by Uintah grants Uintah the authority to transport well-servicing equipment and supplies, including barite. One of the certificates held by Savage grants Savage the authority to transport dry chemicals in bulk. After Savage obtained that certificate, Eisenmann Chemical Company requested that Savage transport barite for use in oil well drilling. After a hearing on the matter in which many expert witnesses testified, the Commission agreed with Uintah's allegation and concluded that "barite does not fall within ... Savage's dry chemical [authority] or any other authority...." We reverse the Commission's order.

Uintah argues that this Court should apply a "reasonableness" or "limited deference" standard when reviewing the Commission's interpretation of whether a certificate encompasses a particular product. According to Uintah, whether the product falls within a general authority granted to a motor carrier is a technical question which calls for the expertise of the Commission and the consideration of policy, which is primarily the responsibility of the Commission. *See Utah Department of Administrative Services v. Public Service Commission*, 658 P.2d 601, 610–11 (Utah

1. This writ was filed before the effective date of the recently adopted Utah Rules of Appellate Procedure. Under those rules, this case would have come before this Court on a petition for review. Utah R.App.P. 14(a).

2. On April 12, 1984, the Commission made and entered its original report and order, and on September 21, 1984, the Commission made and entered its report and order on rehearing and

review. The parties rely on both reports and orders in arguing this case on appeal. Because the latter report and order supplement rather than modify those portions of the April 12, 1984 report and order relevant to our disposition of this case on appeal, we also rely on both reports and orders, and we do not hereinafter distinguish them.

1983) (hereinafter cited as *"Administrative Services"* ).

In *Administrative Services,* we set forth the general principles concerning the standard of review of agency decisions. Where the issue involves the interpretation of a general question of law, we apply a "correction-of-error standard, with no deference to the expertise of the Commission." *Id.* at 608. Where the question involves a basic factual question (as opposed to "ultimate facts"), we extend great deference to the Commission's findings and affirm if the findings are supported by "evidence of any substance whatever." *Id.* at 609. Other issues are reviewed under an intermediate standard. Typical issues reviewed under the intermediate standard include mixed questions of law and fact and Commission interpretations of statutory law the Commission is charged to administer. The intermediate standard requires that the Commission's decisions "fall within the limits of reasonableness or rationality." *Id.* at 610.

■ Generally, the interpretation of a certificate of public convenience and necessity involves a question of general law. *Id.* at 608. However, on certain occasions, the Commission has specialized knowledge necessary to interpret ambiguous terms in a certificate. Thus, when the words in a certificate are used in a technical sense or when extrinsic evidence is necessary to determine their meaning, the intermediate standard of review is appropriate. *See, e.g., Milne Truck Lines, Inc. v. Public Service Commission,* 13 Utah 72, 75, 368 P.2d 590, 592 (1962) (the Commission's superior understanding of the carrier industry and authority delegated by the legislature required use of reasonableness standard when determining whether the term "commodities generally" included petroleum products). However, when the words are used in an ordinary, nontechnical sense involving only questions of law, the issue of certificate construction requires no deference. *Accord Coca-Cola Co. v. Atchison, T. & S.F. Railway,* 608 F.2d 213, 218–20 (5th Cir.1979); *Kansas City Southern Railway v. Great Lakes Carbon Corp.,*

462 F.Supp. 21, 23 (E.D.Mo.1978), *aff'd,* 624 F.2d 822 (8th Cir.1980), *cert. denied,* 449 U.S. 955, 101 S.Ct. 363, 66 L.Ed.2d 220 (1980). For example, in *W.S. Hatch Co. v. Public Service Commission,* 3 Utah 2d 7, 10, 277 P.2d 809, 812 (1954), we treated under the general question of law standard the question of whether transporting acid requires special equipment or falls within the authority for "special service" or "supplies used in ... facilities for the ... development and production of ... minerals" since the Commission had no special expertise. Similarly, we interpreted the phrase "between Salt Lake City, Utah and Provo, Utah" in a certificate as a question of law. *Peterson v. Public Service Commission,* 1 Utah 2d 324, 266 P.2d 497 (1954).

■ The terms to be construed in this case are "dry chemicals" and "barite." These words, while used in their ordinary sense, nevertheless required extrinsic evidence and technical expertise for their interpretation. In determining the meaning of these terms, the Commission heard extensive testimony from chemists, petroleum engineers, and other expert witnesses. The Commission looked to and relied upon factors related to the production and processing of barite and various definitions of "dry chemicals." The Commission then relied on this information to determine the "ultimate facts" or legal conclusions in this case. Under these circumstances, we deem the interpretation of this certificate to require review of a mixed question of law and fact and will apply the reasonableness standard.

The certificate in controversy in this case allows Savage "[t]o operate as a common carrier by motor vehicle in the transportation of DRY CHEMICALS, in bulk, between points in the State of Utah. Restricted against the transportation of phosphorite concentrates from the plant facilities of Chevron Resources and successor companies located North of Vernal, Utah."

The Commission examined this certificate and ordered "[t]hat Savage Brothers, Inc. cease and desist in its transportation of barite insofar as barite is used for well-

drilling purposes." The Commission based this order on the following conclusion:

> [B]arite is not a dry chemical for transportation purposes. Whether barite is a dry chemical ... is of secondary importance to settling this issue. The Commission's primary concern is as to intended use. The barite with which we are here concerned is used as a well-drilling mud. Complainant Uintah has long held authority from the Commission to transport well-drilling supplies, including barite specifically.

This conclusion was made despite the Commission's additional conclusion that "barite is a chemical when its intended use is as a chemical agent for further reaction with other materials for domestic or industrial purposes."

This Court has not adopted the intended use test as a means to limit the extent of a carrier's operating authority when that authority is defined in the certificate by general class terms.[3] We note that the Interstate Commerce Commission ("ICC") has explicitly disapproved the intended use test when defining the scope of the operating authority of a carrier operating with a certificate containing a general commodity description of "liquid chemicals." *Southern Tank Lines, Inc., Extension—St. Bernard, Ohio,* 88 M.C.C. 127 (1962). We likewise disapprove of the intended use test in

this context for the reasons set forth in that opinion:

> [W]e think it to be immaterial from a transportation standpoint whether a commodity which has been produced chemically is to be used as an ingredient in a different product, on the one hand, or on the other, is to be packaged and sold to the general public as a finished or end product. Regardless of their intended use, the transportation of such commodities is merely part and parcel of an overall service to the chemical producers. Motor carriers attempting to afford a complete service under specific or generic authority to transport chemicals and chemical products should hold such authority as will cover any of these commodities irrespective of their intended use or other considerations which often require hairsplitting distinctions.

*Id.* at 141–42.

In this case the term "dry chemicals" is the general authority granted to Savage in the certificate. The legal test presented is whether the material at issue, barite, is outside the class of commodities covered by the certificate, i.e., "dry chemicals." *See W.S. Hatch v. Public Service Commission,* 3 Utah 2d at 13, 277 P.2d at 814. Based on the Commission's conclusion that barite is a chemical, we cannot conclude that barite

---

**3.** In *Lewis v. Wycoff Co.,* 18 Utah 2d 255, 420 P.2d 264 (1966), we affirmed an order by the Commission granting an increase of authority to Wycoff. That order applied the intended use test in defining the phrase "contractor's supplies, contractor's equipment, or parts thereof." Unlike the case before us, where the certificate is drafted in terms of *general authority,* the certificate in *Lewis* defined and identified the commodities authorized by specific reference to the intended use test. We see no reason to reject the intended use test when it is used as an alternative method to define the extent of a carrier's operating authority. The intended use test has been applied by the Interstate Commerce Commission as a means to identify those commodities authorized to be transported on several occasions. That method has subsequently been approved by the courts. *Beeline Express, Inc. v. United States,* 308 F.Supp. 721, 726 (D.Colo.1970), *aff'd,* 398 U.S. 955, 90 S.Ct. 2170, 26 L.Ed.2d 539 (1970), *citing Andrew G.*

*Nelson, Inc. v. United States,* 355 U.S. 554, 78 S.Ct. 496, 2 L.Ed.2d 484 (1958); *Converse v. United States,* 109 F.Supp. 807 (N.D.Cal.1953); *Mitchell Bros. Truck Lines v. United States,* 225 F.Supp. 755 (D.Or.1963), *aff'd,* 378 U.S. 125, 84 S.Ct. 1657, 12 L.Ed.2d 744 (1964); *Whitehouse Trucking, Inc. v. United States,* 261 F.Supp. 9 (N.D.Ohio 1966), *aff'd per curiam,* 388 U.S. 453, 87 S.Ct. 2111, 18 L.Ed.2d 1317 (1967).

The ICC has also established guidelines for applying the intended use test. *See* W.T. Mayfield Sons Trucking Co.—Interpretations, 92 M.C.C. 167 (1963) (guidelines approved in *W.T. Mayfield Sons Trucking Co. v. United States,* 234 F.Supp. 655 (N.D.Ga.1964)). Under the ICC guidelines, the scope of the carrier's operating authority is determined by the condition of the commodities at the time of movement and the carrier's knowledge of the intended use of the commodities at the time of movement. 92 M.C.C. at 170–71.

does not fall within the general grant of authority contained in Savage's certificate.

■ The effect of the Commission's application of the intended use test to this certificate is to retroactively define the scope of a certificate granting general operating authority. There is nothing in Savage's certificate or amendments thereto that would have given Savage notice of the restrictive and limiting application the Commission intended to make by employing the intended use test. Under these circumstances, it was unreasonable for the Commission to use the intended use test to restrict retroactively the scope of a certificate based upon a general operating authority.[4]

As alternatives to the intended use test, Uintah urges us to affirm the Commission's order either on the basis of its definition of "chemicals" or upon what it terms a "common usage" exception. Uintah argues that in order for a substance to be defined as a chemical, it must result "from a chemical or physical *change* induced by processes employed in the chemical industry, including uniting, mixing, blending, and compounding." *Southern Tank Lines, Inc. Extension—St. Bernard, Ohio*, 88 M.C.C. at 142 (emphasis added). In addition, Uintah argues that the removal of impurities necessary to make barite marketable "in no way 'changes' the barite originally present in mined ore." *Cf. Schwerman Trucking Co., Extension— Dry Chemicals*, 98 M.C.C. 350, 353–54 (1965) (the mixture of elements with sodium chloride does not imply that the resulting compound is a result of a physical or chemical change).

We note that a common, generally accepted definition of "chemical" is "a substance (as an element or chemical compound) *obtained by chemical process* or used for producing a chemical effect." *Webster's Ninth New Collegiate Dictionary* 230 (1985) (emphasis added). Consistent with this definition, the administrative law judge found that "the processes to which barite is subjected are processes common to the treatment of other chemicals: jigging, flotation, blending, mixing, [and] precipitating." Consequently, barite is "obtained by chemical process."

■ Our examination of the record shows that the Commission's finding that barite is obtained by chemical process is overwhelmingly supported by the evidence. All the expert witnesses testified that barite could be classified as a chemical under certain circumstances. One of Uintah's witnesses, Professor Milton Wadsworth, testified that in his opinion and based upon what he knew about barite, he would have trouble classifying barite as a chemical for transportation purposes. He admitted, however, that he was unfamiliar with the processing of barite and that he thought that barite was simply ground and shipped without further chemical processing, such as compounding, blending, or mixing. He admitted, "I would say that if it were processed by techniques used by the chemical industry such as uniting, mixing, blending and compounding, I would have a different opinion." All of the later witnesses testified to the chemical processes with which Uintah's expert witness was unfamiliar. These experts testified that barite goes through a chemical process that changes both the physical and the chemical natures

4. The Commission is not without authority to amend or restrict a certificate of public convenience and necessity. Under U.C.A., 1953, § 54–6–20, the Commission may alter, suspend, amend, and revoke any certificate when there is "good cause" and "after notice and hearing." This proceeding, however, was not taken pursuant to section 54–6–20. Uintah instigated this action rather than the Commission; Savage was never given notice that the Commission intended to amend Savage's certificate; and good cause has not been shown for imposing the

restriction. In fact, there were no findings in this case to demonstrate that the entry of Savage into the barite transportation market would endanger the operation of existing carriers to an extent contrary to the public convenience and necessity. Cf. *Milne Truck Lines, Inc. v. Public Serv. Comm'n*, Utah, 720 P.2d 1373, 1376 (1986) (stating that the policy of Utah law is to "foster competition, unless the public convenience and necessity dictates otherwise, because competition in most cases stimulates better service and lower rates ...," *id.* at 1376).

of the barite to conform to specifications of the American Petroleum Institute. In addition, the record contains evidence that barite is classified as a chemical by the National Motor Freight Classification.

■ Uintah argues finally that if barite is considered to be a chemical, the "common usage exception" precludes barite from being considered a chemical for transportation purposes. This exception has been explained as follows: "[C]ommon sense dictates that there should be added a separate category of commodities which, although logically they might come within the ... definition [of "chemical"], cannot with reason be classified as chemicals because they are not, by common usage, considered as such." *Southern Tank Lines, Inc., Extension—St. Bernard, Ohio,* 88 M.C.C. at 139. Molasses, vodka, and whiskey are cited as examples of commodities which fall into this category. *See id.* at 139–40; *Southern Tank Lines, Inc., Extension—Whiskey,* 88 M.C.C. 635, 639–41 (1962). While these foodstuffs and potables are produced by processes similar to those which are used in the chemical industry, this fact alone does not make them "chemicals" since that result would be contrary to common usage and common sense. *Reader Brothers, Inc. v. Mattox,* 73 M.C.C. 404, 406 (1957). Uintah has failed, however, to demonstrate that a similar common usage exception applies to barite. Uintah fails to direct us to any evidence or testimony in the record that supports a common usage exception for barite. Unlike molasses, vodka, and whiskey, barite is sometimes used in chemical processes. Moreover, the ICC has limited the common usage exception to "those products which have not in fact been produced by the chemical industry." *Southern Tank Lines, Extension—St. Bernard, Ohio,* 88 M.C.C. at 140. This limitation bars the use of the common usage exception for those commodities shipped by producers of chemicals and chemical products when the commodity is "directly connected" with the producer's activities in the chemical field. *Southern Tank Lines, Extension—Whiskey,* 88 M.C.C. at 640. The record in this case indicates that all of the barite transported by Savage was shipped at the request of a chemical company, Eisenmann Chemical Company. Therefore, the common usage exception does not prevent barite from being considered a chemical for transportation purposes.

We agree with the administrative law judge that the conclusion that barite is included in the definition of a dry chemical raises the possibility that Savage could undertake to carry a host of other dry substances pursuant to its certificate. But we deem it improper to speculate about the intent of the Commission when Savage's dry chemical certificate was issued. In interpreting certificates, we have said, "Unless there is some uncertainty or ambiguity there is no basis for interpretation or clarification of the certificate. If it were permissible to go back of [sic] the language and contradict its plain terms, intolerable confusion and uncertainty would exist with regard to operating rights." *Peterson v. Public Service Commission,* 1 Utah 2d 324, 327, 266 P.2d 497, 499 (1954) (footnote omitted). This confusion and uncertainty are further aggravated by the possibility of sanctions, which appear to be contemplated by the Commission in this case. We find no uncertainty or ambiguity in Savage's certificate: it authorizes Savage to transport dry chemicals. We conclude, based on the overwhelming evidence in the record and the findings of the administrative law judge as modified by the Commission, that barite is a dry chemical.

If the Commission meant to exclude barite, that exclusion should have been explicitly contained in the certificate. The Commission could have legitimately made an exclusion at the time Savage's certificate was issued as was done with phosphorite concentrates from the Chevron Resources plant near Vernal. For the Commission to now read a barite exception into Savage's certificate and to consider the imposition of sanctions places an unfair hardship on Savage and other carriers similarly situated. These carriers would be forced either to petition the Commission every time they

intend to transport a new commodity under their existing authority or to face the possibility of being sanctioned. A carrier is entitled to notice at the time it receives a certificate that certain commodities are not included under the plain terms of the certificate.

The Commission's report and order are reversed, and the Commission is directed to enter an order consistent with this opinion.

STEWART and ZIMMERMAN, JJ., concur.

HOWE, Justice: (Dissenting).

I dissent. I believe it is fruitless and erroneous to rely on dictionary definitions of a "chemical," or to pursue expert testimony as to whether barite goes through chemical processes. The Commission in granting certificates of convenience and necessity has the right to make its own classifications of products and employ its own definitions, so long as they are reasonable and not misleading. That right was exercised by the Commission here. In June of 1977, the Commission authorized Uintah to transport well-servicing equipment and supplies, including barite, subject to certain restrictions. Years later, the Commission authorized Savage to transport dry chemicals in bulk. Because barite is used for its high gravity properties as a drilling mud, the Commission, in its discretion and very logically, placed the hauling of barite when used for that purpose within the authority of those carriers who transport well-servicing supplies. It thereby excluded such barite from the definition of dry chemicals which it authorized other carriers to haul. The Commission in its report and order held that because Uintah already had specific authority to transport barite under its certificate, neither Savage nor any other carrier could do so under a generally descriptive term. The administrative law judge concluded that "while granting dry chemical authority to Savage, there was no intention [on the part of the Commission] into putting it into the business of carrying well-servicing supplies."

In *Milne Truck Lines, Inc. v. Public Service Commission*, 13 Utah 2d 72, 368 P.2d 590 (1962), we recognized this principle that the Commission may devise and employ its own system of nomenclature. In that case, the carrier had been granted a certificate which authorized it to transport "commodities generally." It later claimed that this certificate gave it authority to haul commodities of any type and in any vehicle, including petroleum and petroleum products in tank vehicles. We affirmed the Commission's refusal to allow the carrier that right, relying upon evidence that neither the Commission nor the carriers operating in this area have ever assumed that the term "commodities generally" included petroleum products in bulk in tank vehicles. We pointed out that the annual reports which all carriers are required to file with the Commission consistently made a distinction between general commodities and petroleum products. We acknowledged the argument of the carrier that "commodities generally" literally meant any commodity of any type and in any vehicle, but rejected that literal interpretation and restricted the term to its meaning under the classifications and system of nomenclature used by the Commission when granting certificates.

"A word is a symbol of thought but has no arbitrary and fixed meaning ... and it may take on values from words and ideas with which it is associated." *Pearson v. State Social Welfare Board*, 54 Cal.2d 184, 195, 5 Cal.Rptr. 553, 559, 353 P.2d 33, 39 (1960). "Words are used in an endless variety of contexts. Their meaning is not subsequently attached to them by the reader but is formulated by the writer and can only be found by interpretation in the light of all the circumstances that reveal the sense in which the writer used the words." *Universal Sales Corp. v. California Press Manufacturing Co.*, 20 Cal.2d 751, 776, 128 P.2d 665, 679 (1942) (Traynor, J., concurring).

In the instant case, the Commission should be granted the same flexibility that we accorded it in *Milne Truck Lines*. We should not deprive it of that privilege because of semantic differences we can find.

It is not claimed by Savage that it obtained its certificate to haul dry chemicals on any representation by the Commission that its certificate would include authority to transport barite. Savage is chargeable with knowing that the Commission classified barite as a well-drilling supply and not as a chemical. Indeed, Uintah had been given specific authority to transport barite, thereby putting Savage on notice of the limitation on its certificate. I would agree that the Commission could not after granting a certificate manipulate its definitions and classifications so as to deprive a carrier of a valuable hauling right which had been represented that the carrier was acquiring. But Savage does not make that contention here.

I would affirm the Commission's order as being reasonable in light of the facts and circumstances of this case.

HALL, C.J., does not participate herein.