MAGNESIUM CORPORATION
OF AMERICA, Petitioner,

v.

AIR QUALITY BOARD and Division of
Air Quality, Department of Environmen-
tal Quality, State of Utah, Respondents.

No. 960354–CA.

Court of Appeals of Utah.

July 10, 1997.

H. Michael Keller, Van Cott, Bagley, Corn-
wall & McCatyhy, Salt Lake City, for Peti-
tioner.

Jan Graham, Atty. Gen. and Denise Chan-
cellor, Asst. Atty. Gen., Salt Lake City, for
Respondents.

Before DAVIS, P.J., WILKINS, Associate P.J., and ORME, JJ.

## OPINION

ORME, Judge:

Petitioner Magnesium Corporation of America (MagCorp) seeks review of an Air Quality Board order upholding the Division of Air Quality's administrative determination that MagCorp violated the terms of the Approval Order governing its magnesium production plant west of Salt Lake City. The Board ruled that MagCorp exceeded its chlorine emission limitation from June 1992 through April 1994. In reaching its conclusion, the Board determined that the Approval Order governing the plant's emissions contemplated that MagCorp's emission limitation included emissions from all sources, including those due to unavoidable breakdowns. We conclude the Board's reading of the Approval Order is incorrect and reverse.

## FACTS

MagCorp produces magnesium metal at a facility located on the edge of the Great Salt Lake. MagCorp operates its plant under an Approval Order issued by the Executive Secretary of the Division of Air Quality, Department of Environmental Quality, State of Utah. The Approval Order limits the chlorine emissions from MagCorp's magnesium production process.

### A. MagCorp's Production Process

MagCorp produces primary magnesium metal from anhydrous magnesium chloride powder derived from concentrated brine solutions drawn from the Great Salt Lake.[1] This magnesium chloride powder is melted in a melt/reactor and then continuously fed in batches to electrolytic cells that separate chlorine from magnesium metal.

The magnesium chloride powder contains a certain amount of magnesium oxide and must first be purified by converting all the magnesium oxide to magnesium chloride before introducing it to the electrolytic process. Purification is accomplished in the melt/reactor by melting the magnesium chloride and then charging it with chlorine gas and other additives to convert the magnesium oxide to magnesium chloride.

The purified molten magnesium chloride from the melt/reactor is sent to electrolytic cells which separate the magnesium from the chlorine using electrolysis. The molten magnesium is then conveyed to MagCorp's foundry for casting. Not all of the chlorine is consumed in this process. Chlorine from the melt/reactor passes through particulate scrubbers and then is transported to the chlorine reduction burner, which converts chlorine to hydrogen chloride (HCl).[2] From the burner, the HCl-rich gas passes through a series of scrubbers that remove much of the HCl before the emission stream passes through the melt/reactor stack.

The electrolytic cells cannot be turned on and off and must be continuously operated and fed batches of molten magnesium chloride from the melt/reactor. MagCorp operates approximately 100 electrolytic cells. If the cells are not continuously fed, they will cool and be destroyed. Replacement of a single cell costs about $70,000 and takes about two weeks. Thus, even if the chlorine reduction burner is not operating, MagCorp must still produce the molten material for the electrolytic cells to remain operational. The heavy price paid pending repair of the chlorine reduction burner is that dangerous chlorine gas is emitted, uncontrolled, directly into the atmosphere.

Most of the chlorine separated in the electrolytic process is sent to a chlorine plant, which generates chlorine for resale and for charging the melt/reactor. The remainder passes through scrubbers before the final emission stream vents through the cathode stack, which is distinct from the melt/reactor stack.

---

1. MagCorp's facility is one of three magnesium plants in the United States, and the only plant employing an anhydrous process. "Anhydrous" is defined as "destitute of water." Webster's Third New International Dictionary 85 (1986).

2. Chlorine and HCl are classified as hazardous air pollutants by the Federal Clean Air Act. See 42 U.S.C.A. § 7412(b) (West 1995).

B. The Chlorine Reduction Burner and the Approval Order Conditions

The chlorine reduction burner is a unique piece of equipment specially designed for the MagCorp facility. It was constructed pursuant to a Notice of Intent dated June 12, 1989, and an Approval Order[3] issued by the Bureau of Air Quality, now known as the Division of Air Quality, dated June 30, 1990, and subsequently amended and reissued a month later. That Approval Order was superseded by an Approval Order dated April 16, 1992.

The chlorine reduction burner is a custom-built, natural gas-fired burner that originally contained a pyroflex liner separating refractory brick on the inside from a steel shell on the outside. A pyroflex liner was recommended by the engineering experts who designed the burner and was approved by the Division. The burner was installed at a cost of more than $5.5 million.

The 1990 and 1992 Approval Orders set new chlorine emission limits for both the melt/reactor stack and the cathode stack.[4] The Division drafted the melt/reactor stack emissions limits in condition 1.B(3) to read, in part, as follows:

Cl₂—emissions shall be determined as follows:

a) The short term Cl₂[, i.e., chlorine gas,] limit in the [melt/reactor] stack during the operation of the [chlorine reduction burner] shall not exceed 400 lb/hr as determined by appropriate stack testing procedures submitted by Magcorp on May 9, 1990 or as specified by the Executive Secretary.

b) The first 12 months of operation—conversion of no less than 50% of the chlorine gas to HCl for the 12-month period, in accordance with the chlorine balance procedure required in Condition 16.D—*In no case shall the chlorine gas emissions exceed 12,000 tons for the first 12 months of operation of the chlorine burner* [.]

c) All subsequent operation—conversion of no less than 80% of the chlorine gas to HCl in any 12-month period, in accordance with the chlorine balance procedure plan as required in Condition 16.D—*In no case shall the chlorine gas emissions exceed 4,800 tons per 12-month period in any subsequent 12-month period of operation.*

There was no mention in condition 1.B(3) of emissions attributable to unavoidable breakdowns.

The Division also drafted a limit for the cathode stack in condition 1.C(3), immediately following the melt/reactor stack limits in the Approval Order. Unlike condition 1.B(3), the limits applicable to the cathode stack explicitly included emissions attributable to unavoidable breakdowns. The cathode stack emission limit was set forth as follows:

(3) Cl₂—3,100 tons per 30-day period based on a rolling sum of successive operating days—28,950 tons per 12-month period. The Cl₂ limits shall be increased by 8.3 ton per day for the number of days during 30-day period the [m]elt/[r]eactor chlorine burner is out of service. These limits are for all emissions from the cathode stack *including emissions from unavoidable breakdowns.*

3. An approval order is an order of the Executive Secretary of the Air Quality Board authorizing construction or modification of air pollution sources in accordance with specific conditions stated in the approval order. By statute, the Executive Secretary has authority, as directed by the Board, to enforce Division of Air Quality rules through the issuance of orders. *See* Utah Code Ann. § 19–2–107(2)(g) (1995).

4. MagCorp had several earlier approval orders which set different chlorine emission limits for the melt/reactor stack and the cathode stack. In MagCorp's Approval Order of July 8, 1988, the chlorine emission limit for the melt/reactor stack was 986 tons per 30-day period based on a rolling sum of successive operating days, or 12,-000 tons per year. The chlorine emission limit for the cathode stack was 3,350 tons per 30-day period based on a rolling sum of successive operating days, for a total of 31,950 tons per year. These and other limits stated in the 1988 Approval Order were established in anticipation of the installation of the chlorine reduction burner. The annual rate was based on anticipated conversion of 50% of the chlorine produced by the melt/reactor process, estimated at 24,000 tons per year. Following the construction of the chlorine reduction burner, the 1990 and 1992 Approval Orders increased the required conversion rate for chlorine from 50% to 80% and thus imposed an enforceable annual chlorine emission limit of 4,800 tons per year on the melt/reactor stack.

Finally, condition 24 of the Approval Order stated, in pertinent part, as follows: "All installations and facilities authorized by this [Approval Order] shall be adequately and properly maintained. The owner/operator shall comply with [Utah Code of Administrative Procedure] R307–1–3.5 and 4.7.... R307–1–4.7 ... addresses unavoidable breakdown reporting requirements."

### C. Emissions from the Melt/Reactor Stack

Total chlorine emissions from the melt/reactor stack without pollution control equipment would be 24,000 tons annually. In order to allow MagCorp to "shake down" the chlorine reduction burner, the initial limitation was set at 12,000 tons. During the first year of the burner's operation, from July 15, 1990 to July 15, 1991, MagCorp did not exceed the 12,000 ton limit. Following this initial period, MagCorp was subject to the 4,800 ton limit.[5]

As reflected in quarterly emission reports filed by MagCorp with the Division, total chlorine gas emissions from the melt/reactor stack did not exceed the "rolling" 12–month 4,800 ton limit specified in the Approval Order until June 1992. At that time, MagCorp began to experience problems with the liner of the chlorine reduction burner. According to MagCorp, the liner began to fail due to the acidic content of the gas stream. These liner failures were not evident until acid etched through the exterior steel shell of the burner, at which point it was necessary to immediately shut down the chlorine reduction burner to avoid catastrophic failure and to make repairs. MagCorp continued to experience liner failures despite numerous repairs and repeated efforts to adjust the operating conditions of the burner to minimize liner failure. MagCorp determined that the problem could only be solved by shutting down the chlorine reduction burner and replacing the entire pyroflex liner with a different material. MagCorp replaced the entire pyroflex liner with chlorobutyl rubber between April 29 and June 23, 1993, at a cost of more than $90,000. MagCorp reported the shutdowns to the Division.

Excess emissions resulted from these "breakdowns." For the rolling 12 months starting in June 1992, MagCorp emitted 5,092 tons of chlorine into the atmosphere. For the rolling 12 months from December 1992 through September 1993, annual chlorine emissions were over 8,000 tons.

MagCorp submitted quarterly emission reports to the Division as required by its Approval Order. Beginning with the first quarter of 1990, the quarterly emission reports filed by MagCorp provided monthly totals and quarterly average totals of chlorine emissions, including total chlorine emissions from the melt/reactor stack. The monthly totals for the chlorine emissions from the melt/reactor stack were computed on the basis of a rolling 30–day sum in accordance with the Approval Order. The rolling 12–month sum of the monthly totals reported in the quarterly emission reports began totaling more than 4,800 tons in June 1992. Thus, MagCorp filed annual excess emissions reports with the Division in January 1993 for the calendar year 1992 and in January 1994 for the calendar year 1993.

Although completion of the liner replacement in June 1993 was nearly a year after initial failure of the chlorine reduction burner, the Board did not suggest this delay was due to any dilatoriness on the part of MagCorp. After the liner was replaced in 1993, the chlorine reduction burner has performed well. MagCorp has stayed within its 4,800 ton limit since April 1994, when the first "rolling" year unaffected by emissions caused by the breakdown began.

On September 29, 1994, the Division issued MagCorp a Notice of Violation and Order for Compliance, alleging violations of applicable regulations and the conditions of the 1992 Approval Order. MagCorp and the Division entered into an agreement settling all the violations except violation no. 5, which alleged MagCorp violated condition 1.B(3)(c) of its 1992 Approval Order by exceeding the 4,800 ton chlorine emission limitation from June 1992 through April 1994.

---

**5.** The Board concluded that annual emissions from the melt/reactor stack, under optimal operating conditions, would be approximately 1,752 tons.

### D. Course of Proceedings and Agency Disposition

A formal administrative hearing was held February 14, 1996, to determine whether violation no. 5 should be upheld. The Board appointed a Board member, Dr. Richard E. Kanner, to act as hearing officer. Before the hearing, the Division stipulated that for purposes of the hearing, the excess emissions would be deemed attributable to "unavoidable breakdowns." The parties further stipulated to the total amount of chlorine emissions and the amount of such emissions exclusive of those from the unavoidable breakdowns for the period from June 1992 through April 1994. The stipulated emission totals showed that chlorine emissions from the melt/reactor stack for the relevant period did not exceed the 4,800 ton limit if chlorine emissions from unavoidable breakdowns were excluded. At the hearing, the stipulations were confirmed with the hearing officer.

Following the hearing, the hearing officer recommended to the Board that violation no. 5 be upheld. The Board adopted the hearing officer's recommendation, with certain modifications, and upheld the issuance of violation no. 5. The Board ruled that MagCorp was not entitled to the benefit of the enforcement exemption in the unavoidable breakdown rule, concluding that the Approval Order language—"In no case shall the chlorine gas emissions exceed 4,800 tons per 12-month period"—contemplated no exceptions for any reason to the absolute maximum of 4,800 tons, even in the event of an unavoidable breakdown. MagCorp seeks judicial review of the Board's order as well as the Board's subsequent sua sponte effort at altering the order.[6]

On June 6, 1996, the Board filed an action in Third District Court seeking imposition of civil penalties against MagCorp based on the Board's order upholding the issuance of violation no. 5. Based on a stipulation of the parties, the Third District Court stayed the action pending our decision.

### ISSUE FOR DETERMINATION

The dispositive issue is whether emissions from unavoidable breakdowns are to be included in determining compliance with the chlorine limit on the melt/reactor stack stated in MagCorp's Approval Order and, thus, whether MagCorp violated the Approval Order by exceeding the limit of chlorine emissions on the melt/reactor stack during the periods in issue.

### STANDARD OF REVIEW

Analogizing to judicial review of an agency's interpretation of its own rules, the Division argues we should apply the so-called intermediate standard of review, upholding its interpretation of the Approval Order so long as it is within the bounds of reasonableness and rationality. *See Thorup Bros. Constr., Inc. v. Auditing Div.,* 860 P.2d 324, 327 (Utah 1993); *Union Pac. R.R. Co. v. Auditing Div.,* 842 P.2d 876, 879 (Utah 1992). However, the rule has traditionally been that an agency's interpretation of "contracts and certificates" presents a question of law, reviewed nondeferentially for correctness, at least so long as ambiguous or technical terms are not involved. *See, e.g., In re SAM Oil, Inc.,* 817 P.2d 299, 302 (Utah 1991); *Morton Int'l, Inc. v. Auditing Div.,* 814 P.2d 581, 585–88 (Utah 1991); *Utah Dep't of Admin. Servs. v. Public Serv. Comm'n,* 658 P.2d 601,

---

6. In the original version of its dispositional order, the Board referred to the events precipitated by the liner failure as "periods of predictable unavoidable breakdowns." After MagCorp filed its petition for review of the Board's Order in this court, the Board reviewed the Order and on its own motion, voted to change the language of the Order. The Board then issued a Notice of Correction changing the language to "periods of predictable excess emissions." MagCorp questioned, in a separate Petition for Writ of Review, the authority and jurisdiction of the Board to change the Order after the original petition for review was filed in the Court of Appeals and without giving formal notice of the change and opportunity for briefing. By order of this court, the two petitions were consolidated.

In view of the parties' stipulation that the excess emissions were to be regarded as due to unavoidable breakdowns, the Board was precluded from unilaterally changing this characterization after the fact. We thus need not decide whether the Board would otherwise have the power to change the language of a final order after that order has come under judicial scrutiny on a timely petition for judicial review.

608 (Utah 1983); *W.S. Hatch Co. v. Public Serv. Comm'n,* 3 Utah 2d 7, 10, 277 P.2d 809, 811 (1954); *Kline v. Utah Dep't of Health,* 776 P.2d 57, 60 (Utah.Ct.App.1989) (stating that court gives no deference to agency's pronouncements on general law issues, such as interpretation of trust agreement and power of attorney). *See also Savage Bros. Inc., v. Public Serv. Comm'n,* 723 P.2d 1085, 1087 (Utah 1986) (stating that when reviewing agency's interpretation of certificate of public necessity, although correction-of-error standard is used when words of certificate are used in ordinary, nontechnical sense, intermediate standard of review is appropriate when agency has specialized knowledge necessary to interpret ambiguous terms in certificate).

■ While some of the traditional approaches to judicial review of agency decisions have been upset by the Utah Administrative Procedures Act (UAPA), *see, e.g., Grace Drilling Co. v. Board of Review,* 776 P.2d 63, 67–68 (Utah.Ct.App.1989) (substituting "substantial evidence on the whole record" test for "evidence of any substance whatever" test for purposes of reviewing adequacy of evidence to support agency factual findings); *Morton,* 814 P.2d at 586–89 (requiring legislative grant of discretion to agency, rather than mere agency expertise, in order to justify using intermediate standard of review when reviewing agency's interpretation of the statute it administers), we are aware of no decision calling this familiar concept into question and the parties have cited none. "As we did prior to UAPA, we review agency interpretations of general law 'under a correction of error standard, giving no deference to the agency's decision.'" *King v. Industrial Comm'n,* 850 P.2d 1281, 1285 (Utah.Ct.App.1993) (quoting *Questar Pipeline Co. v. Utah State Tax Comm'n,* 817 P.2d 316, 318 (Utah 1991)). Accordingly, unless it appears that ambiguous or technical

terms make it impossible to construe the Approval Order as a matter of law, we will review the Division's interpretation for correctness.

## ANALYSIS

MagCorp first argues that the unavoidable breakdown rule [7] is universally effective and applicable to any emission limit under any approval order. Thus, MagCorp argues, the Division has no authority to suspend the application of the unavoidable breakdown rule's enforcement protection. We disagree.

■ Generally, the Division of Air Quality may establish conditions that are more stringent than the general rules set forth in R307–1–4, which includes the unavoidable breakdown rule. *See* Utah Code Admin. P. R307–1–4 (1996). Approval order conditions, as determined under R307–1–3, are source-specific and may differ from the generally applicable rules governing air quality. *See, e.g., id.* R307–1–4.7 (setting forth the unavoidable breakdown rule). The first line of R307–1–4 states: "Section R307–1–3 may require more stringent controls than listed herein, in which case the requirements of R307–1–3 must be met." *Id.* R307–1–4. Thus, the Division had the power to impose approval order requirements at variance with the otherwise applicable unavoidable breakdown rule.

■ Although the Division had the authority to draft an approval order that included "unavoidable breakdown" emissions in the melt/reactor stack limitation, it failed to do so in this case. The Division contends that the "In no case" language of condition 1.B(3)(c) clearly and unambiguously includes breakdown emissions in the 4,800 ton chlorine limit. However, after applying the "plain meaning" rule and reading the Approval Order as a whole, with an eye to harmonizing

7. The unavoidable breakdown rule is found in R307–1–4.7, Utah Code of Administrative Procedure, and provides as follows:

Unavoidable Breakdown. This applies to all regulated pollutants including those for which there are National Ambient Air Quality Standards. *Except as otherwise provided in R307–1–4.7,* emissions resulting from an unavoidable breakdown will not be deemed a violation of

these regulations. If excess emissions are predictable, they must be authorized under the variance procedure in R307–1–2.3. Breakdowns that are caused entirely or in part by poor maintenance, careless operation, or any other preventable upset condition or preventable equipment breakdown shall not be considered unavoidable breakdown.

all of its provisions, we conclude that the Division's and the Board's interpretation is incorrect.

In interpreting the Approval Order, the Board looked first at the "plain language" of the Approval Order, which is invariably the first order of business in construing legally significant writings. *See, e.g., Archer v. Board of State Lands & Forestry,* 907 P.2d 1142, 1145 (Utah 1995) (statutes and administrative rules); *In re Estate of Lewis,* 738 P.2d 617, 621 (Utah 1987) (will); *Gillmor v. Cummings,* 904 P.2d 703, 706 (Utah.Ct.App. 1995) (deed), *cert. denied,* 913 P.2d 749 (Utah 1996); *Diston v. EnviroPak Med. Prods., Inc.,* 893 P.2d 1071, 1075 (Utah.Ct.App.1995) (letter of intent); *Trolley Square Assocs. v. Nielson,* 886 P.2d 61, 63 (Utah.Ct.App.1994) (lease agreement). However, the Board failed to construe the Approval Order in its entirety and to reconcile and harmonize all of its provisions, as is also required. *See, e.g., Schurtz v. BMW of N. Am., Inc.,* 814 P.2d 1108, 1112 (Utah 1991) (statute); *Larrabee v. Royal Dairy Prods. Co.,* 614 P.2d 160, 163 (Utah 1980) (contract). The Division itself admitted at the hearing that the unavoidable breakdown rule is always applicable unless specified otherwise in an approval order. And in this case, condition no. 24 of the Approval Order states that the "owner/operator shall comply" with the unavoidable breakdown rule.

The "In no case" language of the melt/reactor stack limit could, at first glance, be interpreted expansively as encompassing *all* emissions from the melt/reactor stack, including breakdown emissions. However, when read in conjunction with the very next part of the Approval Order, condition 1.C(3) regulating the cathode stack limit, the melt/reactor limit cannot properly be read to include unavoidable breakdown emissions. The last two sentences of the cathode stack limit read, with our emphasis: "The Cl₂ limits shall be increased by 8.3 ton per day for the number of days during 30–day period the [m]elt/[r]eactor chlorine burner is out of service. These limits are for all emissions from the cathode stack *including emissions from unavoidable breakdowns."* Obviously, when the Division intended to include breakdown emissions in an emission limit, it knew how to say so quite unambiguously. If the Division intended that emissions from unavoidable breakdowns be included in the melt/reactor limit, we must assume it would have used explicit language equivalent to that used for the cathode stack. The only reasonable way the provisions in the Approval Order can be reconciled and harmonized is to conclude that the unavoidable breakdown rule applies to emissions from the melt/reactor stack and that emissions from unavoidable breakdowns are exempted from the melt/reactor stack limit.

■ The Division contends that even if the unavoidable breakdown rule does apply to the melt/reactor stack limit, MagCorp did not and could not meet all of the requirements of the rule when its chlorine reduction burner was off-line. Application of the unavoidable breakdown rule requires the operator of the pollution source to take "all reasonable measures" to reduce emissions during breakdown conditions, which may include "immediate curtailment of production, operations, or activities at all installations of the source." Utah Code Admin. P. R307–1–4.7.3 (1996). However, the rule further states:

> In the event that production, operations or activities cannot be curtailed so as to so limit the total aggregate emissions without jeopardizing equipment or safety or measures taken would result in even greater excess emissions, the owner or operator of the source shall use the most rapid, reasonable procedure to reduce emissions.

*Id.*

MagCorp's production of magnesium cannot be curtailed without jeopardizing its equipment. The electrolytic cells of MagCorp's chlorine burner will suffer catastrophic damage if allowed to cool. Therefore, MagCorp should have used the "most rapid, reasonable procedure to reduce emissions" once the chlorine reduction burner broke down. *See id.* The Division concedes that "all parties knew, prior to the issuance of the approval order, that MagCorp would not be able to take any effective steps to reduce emissions when the Chlorine Reduction Burner was off-line." Thus, in effect, the most rapid, reasonable curtailment proce-

**660**

dure, consistent with the scheme of R307–1–4.7.3, was to do nothing in the short term other than concentrate on effecting the liner replacement that would cure the problem—and that is just what MagCorp did.

## CONCLUSION

The Board erred in upholding the Notice of Violation. Although the Division of Air Quality had the power to supersede in the Approval Order the relief available to MagCorp under the unavoidable breakdown rule, it failed to do so. By looking at the plain language of the Approval Order in its entirety, with an eye toward harmonizing all of its provisions, we conclude that condition

1.B(3)(c) did not supplant the unavoidable breakdown rule so as to include unavoidable breakdown emissions in the melt/reactor stack limit.[8] The decision of the Air Quality Board is therefore reversed.

DAVIS, P.J., and WILKINS, Associate P.J., concur.

---

8. Because we conclude the unavoidable breakdown rule applied, we have no occasion to consider whether MagCorp, because it was experiencing more than temporary equipment failure, should have applied to the Board for a variance from its Approval Order conditions. *See* Utah Code Admin. P. R307–1–2.3 (1996). We also need not address whether violation no. 5 is time-barred with respect to any emissions that occurred more than one year before issuance of the Notice of Violation or the subsidiary contention that MagCorp did not properly report its emissions data.